IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>STATE OF MINNESOTA,<br><br>*Defendant*. | Civil No.<br><br>THREE-JUDGE COURT REQUESTED |

## COMPLAINT

"The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007). This logic extends to invidious discrimination on the basis of sex. Yet in the name of stopping race and sex discrimination, Minnesota law requires the state to discriminate against its current and prospective employees on the basis of race and sex. But this is not just an ineffective plan to stop discrimination. It is an unlawful plan. To break this discrimination chain once and for all, the United States of America brings this action against the State of Minnesota under Title VII of the Civil Rights Act of 1964 and alleges:

### INTRODUCTION

1. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600

1

U.S. 181, 208 (2023) (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)). Federal civil rights laws, including Title VII of the Civil Rights Act of 1964, reflect this truth.

2.　Under Title VII, it is unlawful for employers to discriminate against, or limit, segregate, or classify in any way that would adversely affect the employment of, current or prospective employees because of their race, color, religion, sex, or national origin.[1] 42 U.S.C. § 2000e-2(a)(1)-(2).

3.　Yet in 1979, the United States Supreme Court "introduce[d] into Title VII a tolerance for the very evil that the law was intended to eradicate," *United Steelworkers of Am. v. Weber*, 443 U.S. 193, 254-55 (1979) (Rehnquist, J., dissenting), and held that Title VII authorizes private employers to adopt "affirmative action plans designed to eliminate conspicuous racial imbalance in traditionally segregated job categories," *id.* at 209.

4.　Because Title VII's text does not support such an exception to its prohibition of racial discrimination in employment, the Court resorted to Title VII's "spirit" to justify its holding. *Id.* at 201 (quoting *Holy Trinity Church v. United States*, 143 U.S. 457, 459 (1892)).

5.　Eight years later, the Court extended *Weber* to public employers and sex-based affirmative action. *Johnson v. Transp. Agency, Santa Clara Cnty.*, 480 U.S. 616, 639-42 (1987).

---

[1] References herein to "race" encompass race, color, and national origin.

2

6. With that, the Court "complete[d] the process of converting [Title VII] from a guarantee that race or sex will *not* be the basis for employment determinations, to a guarantee that it often *will*." *Id.* at 658 (Scalia, J., dissenting).

7. Diverging from *Weber* and *Johnson*, the Supreme Court has since directed, when interpreting Title VII, that "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. *Only the written word is the law*, and all persons are entitled to its benefit." *Bostock v. Clayton County*, 590 U.S. 644, 653 (2020) (emphasis added).

8. "Title VII's 'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656. Under that test, "[s]o long as the plaintiff's sex [or race, color, religion, or national origin] was one but-for cause of [the challenged employment decision], that is enough to trigger the law." *See id.*

9. "Employers may not 'fail or refuse to hire or . . . discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's'" race, color, religion, sex, or national origin. *See id.* at 658 (quoting 42 U.S.C. § 2000e-2(a)(1)) (emphasis omitted). And it does not matter if factors other than race, color, religion, sex, or national origin contributed to the employer's decision. *See id.* at 659.

10. "[P]ut differently, if changing the employee's [race, color, religion, sex, or national origin] would have yielded a different choice by the employer—a statutory violation has occurred." *See id.* at 659-60.

11. Minnesota laws, enacted around the time that *Weber/Johnson* greenlighted race and sex discrimination under Title VII, demonstrate the consequences of these precedents.

12. To "eliminate the effects of past and present discrimination, intended or unintended, on the basis of protected group status" in state civil service, Minnesota law requires the adoption of "a statewide affirmative action program," Minn. Stat. § 43A.19, subd. 1(a), and the "consideration of affirmative action goals on all staffing and personnel decisions," Minn. R. 3905.0100.

13. By following this statutory and regulatory affirmative action mandate, Minnesota, as an employer, is engaged in a pattern or practice of resistance to the full enjoyment of rights secured by Title VII, and that pattern or practice is intended to deny prospective and existing state employees the full exercise of Title VII rights. *See* 42 U.S.C. § 2000e-6(a).

## JURISDICTION AND VENUE

14. This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. *See also* Exec. Order No. 12068, 43 Fed. Reg. 28971 (June 30, 1978) ("Providing for Transfer to the Attorney General of Certain Functions Under Section 707 of Title VII of the Civil Rights Act of 1964, as Amended").

15. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 2000e-6.

16. Venue for this action is proper in the United States District Court for the District of Minnesota, pursuant to 28 U.S.C. § 1391(b).

17. Because this case is of general public importance, as certified by the Attorney General of the United States, *see* Ex. A, Plaintiff United States of America respectfully invokes its right under 42 U.S.C. § 2000e-6(b) to expedited proceedings before a three-judge district court.

## PARTIES

18. Plaintiff United States of America (United States) brings this action under Section 707 of Title VII, as amended, 42 U.S.C. § 2000e-6.

19. Defendant State of Minnesota (Minnesota) is a "person," as defined by 42 U.S.C. § 2000e(a), and an "employer," as defined by 42 U.S.C. § 2000e(b).

## FACTS

### Minnesota's Statutory and Regulatory Affirmative Action Regime

20. For the stated purposes of "assur[ing] that positions in the executive branch of the civil service are equally accessible to all qualified persons, and . . . eliminat[ing] the effects of past and present discrimination," Minnesota law mandates a statewide affirmative action program for state civil service, Minn. Stat. § 43A.19, subd. 1(a), and requires "consideration of affirmative action goals on *all* staffing and personnel decisions," Minn. R. 3905.0100 (emphasis added).

21. Minnesota Management and Budget (MMB) is the state agency charged with overseeing the statewide affirmative action program. *Affirmative Action*, Minnesota Management & Budget, https://perma.cc/YT7M-S9YR.

22. MMB describes "Affirmative Action" as "[p]ositive steps to get qualified individuals who were historically discriminated in employment"; quantitative and reactive;

5

and focused, *inter alia*, on race and sex. *2022-2024 Affirmative Action Data Analysis Training*, Minnesota Management & Budget, 7, https://perma.cc/BN5W-VKCH.

23. The Commissioner of MMB must "adopt and periodically revise . . . a statewide affirmative action program." Minn. Stat. § 43A.19, subd. 1(a); *see also id.* § 43A.02, subd. 13.

24. The statewide affirmative action program must include, *inter alia*, "objectives, goals, and policies"; "procedures, standards, and assumptions to be used by agencies in the preparation of agency affirmative action plans, including methods by which goals and timetables are established"; and "requirements for annual objectives and submission of affirmative action progress reports from heads of agencies." Minn. Stat. § 43A.19, subd. 1(a).

25. The Commissioner must "establish statewide affirmative action goals" based on (1) "the percentage of members of each protected class in the recruiting area population who have the necessary skills"; and (2) "the availability for promotion or transfer of current employees who are members of protected classes." Minn. Stat. § 43A.19, subd. 1(b)(1)-(2).

26. "Agency heads" likewise shall establish numerical goals by protected group. Minn. R. 3905.0600, subp. 4-5. Goals are determined by comparing the protected-group composition of the agency unit work force to the composition of the relevant civilian labor market. *Id.* at subp. 5.

27. If the comparison shows that a unit underutilizes a protected group, the agency head shall establish a goal for that protected group in that unit, *id.*, and a timetable for meeting that goal, *id.* at subp. 6.

28. All Minnesota executive agencies are statutorily required to classify employees and applicants as either members or non-members of a protected class or group. *See Monitoring the Hiring Process*, Minnesota Management & Budget, https://perma.cc/XE5U-YNKH (requiring tracking of "underutilization of a protected group in a job category").

29. The protected groups or classes under Minnesota law are "females, persons with disabilities, and members of the following minorities: Black, Hispanic, Asian or Pacific Islander, and American Indian or Alaskan native." Minn. Stat. § 43A.02, subd. 33.

30. Given this definition of who is "protected," Minnesota law necessarily requires classification of employees and potential employees by race and sex. Absent such classification, Minnesota could not develop and implement its statutorily mandated affirmative action policies.

31. MMB also instructs agencies to calculate "Final Availability," also known as, "What We Should Look Like." This is "[a]n estimate percentage of qualified females, racial/ethnic minorities, or individuals with disabilities available for employment in the relevant labor market who are available . . . in a given job category." It is "used to identify what the qualified workforce in the job category [is] supposed to look like." *2022-2024 Affirmative Action Data Analysis Training*, *supra* ¶ 22, at 15.

32. Final availability is "compared to the job category headcounts to determine the existence of underutilization." *Id.*

33. If an agency does not meet its affirmative action hiring goals—meaning "there is an underutilization of a protected group in a job category"—the hiring manager must "justify its nonaffirmative action hires" by submitting a Pre-Hire Justification Form (PHJ) that "explain[s] the reason for hiring a non-affirmative candidate." Minn. Stat. § 43A.191, subd. 3(c); *Monitoring the Hiring Process*, *supra* ¶ 28.

34. Put otherwise, Minnesota requires its hiring managers to jump through additional hoops to hire employees with disfavored skin colors or sex chromosomes.

35. State agencies analyze PHJ forms and "may determine [that] the minimum qualifications need to change or [that] the agency needs to recruit differently for this position." *Monitoring the Hiring Process*, *supra* ¶ 28.

36. Minnesota's statutes, rules, and policies therefore are intended to require, and do require, agencies to balance the race and sex of their work forces with the relevant civilian labor markets. Minn. R. 3905.0600, subp. 5 ("The [numerical employment] goals must be based on a comparison of the composition of the agency or agency subdivision work force with the composition of the relevant civilian labor force in an identified labor market area.").

37. Each agency must also "prepare and implement an agency affirmative action plan" in accordance with statutory requirements and rules promulgated thereunder. Minn. Stat. § 43A.191, subd. 2(a).

38. MMB supplies agencies with templates and other resources to prepare and implement these plans. *See Affirmative Action Resources*, Minnesota Management & Budget, https://perma.cc/2NT4-G9LZ.

39. For agencies with 25 or more employees, the plan must "identify and describe methods for developing programs and program objectives designed to meet affirmative action goals" and "describe methods of auditing, evaluating, and reporting program success, including a procedure that requires a preemployment review of all hiring decisions for goal units with unmet affirmative action goals and prereview of all layoff decisions to determine their effect on agencies' affirmative action goals and timetables." Minn. R. 3905.0400, subp. 1(H)-(I).

40. For agencies with less than 25 employees, the plan must "state the agency head's objective to hire members of protected groups when vacancies occur if an apparent underutilization of protected group members exists in the agency work force." Minn. R. 3905.0400, subp. 2(B).

41. The Commissioner must audit each agency annually "to determine the rate of compliance with affirmative action requirements," and if an agency "fails to meet any of its affirmative action requirements for two consecutive years," the Commissioner must report the findings to the governor. Minn. Stat. § 43A.191, subd. 3(a).

42. An agency not in compliance with affirmative action requirements must "identify methods and programs to improve performance, to reallocate resources internally in order to increase support for affirmative action programs, and to submit resource

reallocation proposals to the commissioner for approval." Minn. Stat. § 43A.191, subd. 3(f).

43. Minnesota law also contemplates incentives for meeting affirmative action goals and requirements: "The commissioner shall establish a program to recognize an agency that has made significant and measurable progress in implementing an affirmative action plan." Minn. Stat. § 43A.191, subd. 3(g).

44. Agencies are "encouraged to develop other innovative ways to promote awareness, acceptance, and appreciation for diversity and affirmative action. These innovations will be considered when evaluating an agency's compliance" with affirmative action requirements. Minn. Stat. § 43A.191, subd. 3(e).

**Minnesota Department of Human Services**

45. The Minnesota Department of Human Services' (DHS) Hiring Justification Policy, No. 4100.250 (DHS Policy) provides an example of how Minnesota discriminates against its employees, in violation of Title VII, under its statutory and regulatory affirmative action regime. *See* Ex. B.

46. The DHS Policy lists Minnesota Statutes, Chapter 43A; and Minnesota Rules, Chapter 3905, as its express authority. *Id.* at 1.

47. The DHS Policy's stated purpose is "to ensure DHS meets affirmative action responsibilities to comply with state statutes and [to] increase the diversity of its workforce to reflect and effectively serve its client base." *Id.*

48. The DHS Policy is consistent with Minnesota's statutory and regulatory affirmative action regime, detailed in paragraphs 20-44, *supra*.

49. Under the DHS Policy, "[h]iring supervisors must provide a hiring justification when seeking to hire a non-underrepresented candidate when hiring for a vacancy in a job category with underrepresentation." Ex. B at 1.

50. The DHS Policy prohibits hiring supervisors from "mak[ing] an offer of employment to a non-underrepresented candidate for vacancies in job categories with underrepresentation, before a hiring justification is approved by DHS Equal Opportunity and Access Division[.]" *Id.* at 3.

51. A hiring supervisor must offer interviews to at least three underrepresented candidates if the interview pool contains three or more underrepresented candidates. *Id.*

52. "Underrepresented" means that the full-time equivalent "representation of one or more protected groups is less than that group's estimated availability in the relevant geographic area and labor force." *Id.* at 2.

53. Minnesota has expressed that its affirmative action plans, including the DHS Policy, are required by Minn. Stat. §§ 43A.19 and 43A.191, and their implementing rules, and that these plans are prospective and analysis-driven, and designed to remedy manifest underutilization of qualified protected group members identified in specific job classifications.

54. Yet Minnesota identifies no prior or present discrimination to justify its race- and sex-conscious employment policies (such as the DHS Policy). Instead, it has adopted a universal regime for all agencies premised on a lack of numerical congruence between demographic data in a given agency work force and the relevant civilian labor market.

55. Minnesota's affirmative action regime therefore violates Title VII even under the permissive *Weber/Johnson* framework. *See Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 695 (8th Cir. 2009) ("An affirmative action policy is valid [under Title VII] if the policy is remedial and narrowly tailored to meet the goal of remedying the effects of past discrimination.").

## CAUSES OF ACTION

### Count 1:
### Pattern or Practice in Violation of Section 703(a)(1) of Title VII

56. The United States realleges and incorporates by reference paragraphs 1-55 of the Complaint as if fully stated herein.

57. Because staffing is a zero-sum game, when Minnesota gives preferences to employees or prospective employees because of their race, color, national origin, and sex, it inevitably and necessarily discriminates against other employees or prospective employees because of their race, color, national origin, and sex.

58. Minnesota engages in a pattern and practice of discrimination against state employees and prospective employees, in violation of Section 703(a)(1) of Title VII, as amended, 42 U.S.C. § 2000e-2(a)(1), by making staffing and personnel decisions, including hiring, promotions, transfers, and layoffs, based on individuals' race, color, national origin, and sex.

59. Minnesota engages in a pattern and practice of discrimination against state employees and prospective employees on the basis of race, color, national origin, and sex

in violation of Section 703(a)(1) of Title VII, as amended, 42 U.S.C. § 2000e-2(a)(1), by employing race- and sex-based employment goals.

60. Minnesota engages in a pattern and practice of discrimination against state employees and prospective employees on the basis of race, color, national origin, and sex in violation of Section 703(a)(1) of Title VII, as amended, 42 U.S.C. § 2000e-2(a)(1), by requiring state agencies to "justify" and receive approval before hiring employees who are not female, black, Hispanic, Asian, Pacific Islander, American Indian, or Alaskan native.

61. The Attorney General has reasonable cause to believe that Minnesota regularly and purposefully treats certain employees and prospective employees less favorably because of their race, color, national origin, and sex, and that this unlawful discrimination, that is mandated by Minnesota statutes and implementing rules, is Minnesota's regular procedure or policy.

62. The Attorney General has reasonable cause to believe that Minnesota's race- and sex-conscious staffing and personnel practices violate Section 703(a)(1) and are "a pattern or practice of resistance to the full enjoyment of" the rights of state employees and prospective employees to equal employment opportunities without discrimination because of race, color, national origin, or sex. *See* Section 707(a) of Title VII, as amended, 42 U.S.C. § 2000e-6(a).

63. The United States, through the United States Department of Justice, has notified Minnesota of the United States' determination that Minnesota's pattern or practice of discrimination described herein is unlawful.

## Count 2:
## Pattern or Practice in Violation of Section 703(a)(2) of Title VII

64. The United States realleges and incorporates by reference paragraphs 1-63 of the Complaint as if fully stated herein.

65. Minnesota Statute § 43A.02, subd. 33, defines "protected groups" by race, color, national origin, sex, and disability. This definition is not merely descriptive; it is incorporated directly into Minnesota's affirmative action mandate in Chapter 43A, including the numerical-goal, underutilization, and pre-hire-justification requirements. As a result, Minnesota classifies employees and prospective employees into discrete racial and sex-based groups for the purpose of affecting employment statuses and decisions.

66. Through these statutory and regulatory provisions, Minnesota uses race, color, national origin, and sex as operative decision-making criteria in staffing and personnel actions.

67. Minnesota law requires agencies to track "underutilization" of the defined protected groups and take affirmative steps to eliminate such underutilization. Supervisors must identify the race and sex composition of the candidate pool and determine whether a protected group is underutilized in the relevant category. When underutilization exists, agencies impose additional procedural burdens on candidates who are not members of the designated protected groups.

68. These classifications deprive those who are not in Minnesota's chosen protected groups of employment opportunities, and adversely affect their employment

statuses, in violation of Section 703(a)(2) of Title VII, as amended, 42 U.S.C. § 2000e-2(a)(2).

69. Minnesota limits, segregates, and classifies its employees and prospective employees based on race, color, national origin, and sex to effectuate its unlawful race- and sex-preference policies, because only through such limiting, segregating, and classifying can Minnesota accomplish its race- and sex-balancing goals.

70. The Attorney General has reasonable cause to believe that Minnesota regularly and purposefully limits, segregates, and classifies employees and prospective employees because of their race, color, national origin, and sex, and that this limitation, segregation, and classification, that is mandated by Minnesota statutes and implementing rules, is Minnesota's regular procedure or policy.

71. The Attorney General has reasonable cause to believe that Minnesota's limitation, segregation, and classification of its employees and prospective employees violates Section 703(a)(2) and is "a pattern or practice of resistance to the full enjoyment of" the rights of state employees and prospective employees to equal employment opportunities without discrimination because of race, color, national origin, or sex. *See* Section 707(a) of Title VII, as amended, 42 U.S.C. § 2000e-6(a).

72. The United States, through the United States Department of Justice, has notified Minnesota of the United States' determination that Minnesota's pattern or practice of limiting, segregating, and classifying employees and prospective employees described herein is unlawful.

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays that this Court enter judgment against Minnesota and grant the following relief:

a. A declaratory judgment that Minnesota is engaged in a pattern or practice that unlawfully discriminates against, limits, segregates, and classifies employees and prospective employees on the basis of race, color, national origin, and sex in violation of Title VII;

b. A permanent injunction prohibiting Minnesota and its officers, agents, employees, successors, and attorneys, and other persons who are in active concert or participation with Minnesota, from further violating Title VII by implementing the race- and sex-conscious staffing and personnel practices (including, but not limited, to hiring, promoting, transferring, or laying-off current or prospective employees, or any other similar actions), on the basis of race, color, national origin, or sex.

c. An award of equitable relief to any employees and prospective employees who faced discrimination on the basis of race, color, national origin, or sex as a result of Minnesota's race- and sex-conscious staffing and personnel practices (including, but not limited, to hiring, promoting, transferring, or laying-off current or prospective employees, or any other similar actions);

d. An award of any applicable costs and fees; and

e. An award of all such other additional relief as the interests of justice may require.

DATED: January 14, 2026

DANIEL N. ROSEN
United States Attorney
District of Minnesota

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

JESUS A. OSETE
Principal Deputy Assistant Attorney General

ERIC SELL
Counsel

JEFFREY MORRISON
Acting Chief, Employment Litigation Section

*s/ Greta Gieseke*
GREGORY DOLIN (DC No. 497455)
Senior Counsel
GRETA GIESEKE (TX No. 24132925)
Trial Attorney

Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 514-3847
Email: greta.gieseke@usdoj.gov

ATTORNEYS FOR PLAINTIFF
UNITED STATES OF AMERICA