UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

                  Plaintiff,

      vs.

State of Minnesota,

                  Defendant.

Case No. 26-cv-273
(PJS-RWG-DPM/SGE)

**MEMORANDUM OF LAW IN
SUPPORT OF DEFENDANT'S
MOTION FOR A MORE
DEFINITE STATEMENT**

## INTRODUCTION

The United States Department of Justice ("DOJ") brings pattern or practice cases in the ordinary course under Section 707(a) of Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e-6(a). What is extraordinary here is that the DOJ also invoked its unique powers under Section 707(b). *See* 42 U.S.C. § 2000e-6(b). The Attorney General personally certified this case as one of "general public importance" and empaneled a three-judge district court with direct review in the U.S. Supreme Court—a device the DOJ has not used in more than 50 years. Congress reserved this vehicle for systemic discrimination claims serious enough to warrant proceedings that must be "in every way expedited." *Id*.

But expedition demands a defined target. A pattern or practice case turns on whether discrimination is the employer's "standard operating procedure," not an abstract disagreement with a statutory framework. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). The DOJ's Complaint does not identify a discernible statewide practice with the particulars Minnesota must know to answer and this Court must have to manage an expedited case. Instead, the DOJ gestures broadly at Minnesota statutes,

administrative rules, and one agency's defunct policy, without specifying which directives allegedly compel disparate treatment, in which agencies, in which job classifications, or when. Minnesota therefore seeks a more definite statement so it can meaningfully answer and the Court can manage discovery in a case the DOJ insists must be expedited.

The DOJ asks this Court to accept that its pre-suit investigation was sufficient to support "reasonable cause" and invoke this extraordinary posture. The DOJ opened its investigation in July 2025, stated it had "not reached any conclusions," and promised to confer regarding scope, yet Minnesota received no substantive response after promptly requesting a meeting to clarify the investigation's focus. On January 7, 2026, Minneapolis resident Renee Good was killed in her southside neighborhood by a federal immigration agent. Her death sparked a public safety emergency and federal escalation that imposed immediate, concrete harms on Minnesotans, disrupting daily life and inflicting economic harm in communities most directly affected by the ensuing enforcement surge. In a striking coincidence, the next day, January 8, the DOJ simultaneously declared its investigation complete, asserted "reasonable cause" to believe Minnesota maintains a statewide "pattern or practice" of employment discrimination, and the Attorney General personally authorized this suit and requested a three-judge panel. (Doc. 1-1.) The DOJ demanded acceptance of an undefined permanent injunction within six days or face suit. Minnesota requested written terms to evaluate the proposal, but none were provided. Then, DOJ sued.[1]

_____

[1] Minnesota notes this timeline against a broader backdrop. Since December 2025, the Trump Administration has undertaken a pattern or practice of punitive actions directed at Minnesota across multiple agencies, which places the investigation's abrupt conclusion, (Footnote continued on next page.)

Courts generally do not police the Attorney General's certification or reasonable-cause determination. But such deference presumes a *sufficient complaint*—one that contains "substantial allegations" of a pattern or practice of discrimination and "clearly demonstrate[s] the basis" for invoking Title VII's most extraordinary mechanism. *United States v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Loc. No. 1*, 438 F.2d 679, 681 (7th Cir. 1971). Minnesota does not ask this Court to second-guess the DOJ's determination. Minnesota seeks something more basic: a more definite statement identifying the specific statewide practices the DOJ contends constitute the alleged pattern or practice, so Minnesota can meaningfully answer and the Court can manage a case the DOJ insists must proceed expediently. *See* Fed. R. Civ. P. 12(e).

## BACKGROUND

The Complaint's core premise is that Minnesota has a statewide "standard operating procedure" of discrimination. But the pleading does not identify the practice with the specificity that premise requires. It points to four sources of authority and practices yet

―――――――――――――――

the DOJ's six-day ultimatum, and its three-judge request in context. *See, e.g.,* threatened withholding of SNAP-related administrative funding tied to accelerated verification demands, resulting in a court injunction; actions to halt or suspend SBA-related funding streams affecting Minnesota partners and borrowers; attempted freezing of more than $10 billion in federal child-care and family-assistance funding administered through HHS/ACF (enjoined); termination or threatened clawback of CDC public-health infrastructure grant funding affecting Minnesota (enjoined or challenged); a public announcement pausing substantial Medicaid payments to Minnesota; a large-scale immigration enforcement surge and related operations in Minnesota (Operation Metro Surge and Operation Parris); litigation and demands seeking unredacted voter-registration data from Minnesota; and threatened or initiated federal civil-rights enforcement actions in other program areas, including Title IX-related enforcement steps against Minnesota education entities, and more.

does not say which one is supposedly unlawful, whether the entire system (i.e., laws, rules, plan) is a *per se* violation of Title VII, or whether only a part of the system causes discrimination. And the Complaint never rules in or out which of Minnesota's many executive-branch agencies, boards, and commissions the DOJ's allegations encompass, no matter how small. Minnesota therefore provides an overview of its executive-branch merit employment system to supply context and to show why a more definite statement is necessary before Minnesota can answer and the Court can manage the case.

## I.    MINNESOTA'S STATE MERIT EMPLOYMENT SYSTEM.

Chapter 43A establishes Minnesota's executive-branch personnel merit system—governing recruitment, selection, and advancement. Minn. Stat. § 43A.01, subd. 1. The system is designed to develop "an effective, productive, and responsive work force" that meets the "demands of society, equity and law." *Id*.

### A.    The Statewide Program.

Enacted in 1981, Minnesota Statutes section 43A.19 establishes a statewide affirmative action program (the "Program"). The statute supplies the Program's structural components—"objectives, goals, and policies," and "procedures, standards and assumptions," that Minnesota's executive branch agencies use to prepare their individual affirmative action plans. Minn. Stat. § 43A.19, subd. 1.

The Program's function is methodological. It provides a common statewide analytical framework and reporting standards designed "to eliminate the effects of past and present discrimination" and ensure that employment is "equally accessible to all qualified persons." *Id*. at subd. 1(a). The Program does not mandate particular hiring outcomes.

B.    **Individual Agency Plans.**

The Program's implementation occurs through agency-level affirmative action plans (the "Plans"). Every two years, each executive branch agency head prepares and submits a Plan for approval by the Commissioner of the Minnesota Department of Management and Budget ("MMB"). Minn. Stat. § 43A.191, subd. 2(a), (e).

Plans apply the Program's methodology through job-classification-specific determinations that vary across agencies, divisions, and departments. For agencies with 25 or more employees (i.e., large agencies),[2] Plans must include:

1.    Procedures to identify agency job classifications in which protected groups are underutilized, determined through statistical comparisons tied to job type, agency, and relevant labor-market availability. *See* Minn. R. 3905.0400, subp. 1(A); Minn. R. 3905.0600, subps. 1–3.

2.    Establishment of goals and timetables only where underutilization exists in a specific job classification or goal unit. *See* Minn. R. 3905.0400, subp. 1(G); Minn. R. 3905.0600, subps. 4–6.

3.    Methods to meet those goals. *See* Minn. R. 3905.0400, subp. 1(H–I).

4.    Audit and accountability procedures when goals remain unmet, including Plan-based auditing and evaluation procedures, such as preemployment review of hiring decisions in goal units with unmet goals. *See* Minn. Stat. § 43A.191, subd. 3(c); Minn. R. 3905.0400, subp. 1(I).

---

[2] The Complaint cites Minn. R. 3905.0400 and describes agency Plan requirements. (Compl. ¶¶ 39–40.) But this rule excludes small agencies from the requirements to perform statistical underutilization analyses under Minn. R. 3905.0600, establish numerical goals or timetables, designate goal units, or implement preemployment review procedures. The Complaint does not state whether those agencies—subject to materially different compliance obligations—are excluded from DOJ's theory or are nonetheless included within the alleged "standard operating procedure." That ambiguity is consequential, as it determines whether the suit reaches a subset of executive-branch agencies or the entire branch, and whether discovery must encompass agencies whose regulatory obligations do not implicate the practices the DOJ appears to challenge.

MMB training materials—incorporated in the Complaint[3]—illustrate what Plans are and what they are not. Plans *are* tools for eliminating barriers and expanding recruitment and outreach.[4] Plans and Plan goals *are not* quotas or licenses to make employment decisions based on protected class status.[5] The training frames goals as analytical benchmarks, warning that they cannot justify preferential treatment based on race or sex:



---

[3] *See Zean v. Fairview Health Servs.*, 858 F.3d 520, 526–27 (8th Cir. 2017) (holding that documents embraced by the pleadings may be considered on a Rule 12 motion and affirming dismissal where incorporated contractual documents refuted complaint's conclusory allegations; courts do not accept "a legal conclusion couched as a factual allegation" contradicted by materials integral to the complaint).

[4] *See* (Doc. 1) ("Compl."), at ¶ 22 (citing *Affirmative Action Data Analysis Training*, Minnesota Management & Budget, 8, *available at* https://perma.cc/BN5W-VKCH) (hereafter "*Affirmative Action Data Analysis Training*").

[5] *Id.* at 22.

### C.    The DHS Hiring Justification Policy.

External to its Plan, the Minnesota Department of Human Services ("DHS") adopted an internal Hiring Justification policy in August 2025. (Doc. 1-2.) It was in effect for about two months and superseded by MMB policy on October 20, 2025.[6]

The DHS Hiring Justification Policy applied only to vacancies in job categories with identified underrepresentation of protected class members, and only if qualified candidates from an underrepresented group were selected for interview. In that narrow context, if a hiring manager intended to select a non-underrepresented candidate, they were required to document the objective, job-related reasons for that decision and engage with DHS's Equal Opportunity and Access Division before extending an offer.

The policy did not alter minimum qualifications for any position, require selection of any particular candidate, deny employment based on a candidates non-membership in an underrepresented group, or mandate hiring quotas. Rather, it was designed to guard against arbitrariness and bias by ensuring that hiring decisions in DHS job classifications with established underutilization were grounded in objective criteria.

## II.    FEDERAL LAW REQUIREMENTS.

In January 2025, President Donald J. Trump issued Executive Order 14173, entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025). The Order directed federal agencies to review certain federal programs and diversity practices. But it did not amend (nor could it)

---

[6] *See* Section 3(c), *infra.*

Title VII or repeal the Equal Employment Opportunity Commission's ("EEOC") regulations governing voluntary affirmative action or workforce reporting.

Title VII's implementing regulations expressly authorize employers to undertake voluntary affirmative action measures. 29 C.F.R. pt. 1608. Permissible measures include conducting a workforce self-analysis, identifying manifest imbalance, and taking corrective steps that are temporary and flexible. *Id*. Indeed, Congress provided a statutory defense under Title VII when an employer acts "in good faith, in conformity with, and in reliance on" these EEOC regulations. 42 U.S.C. § 2000e-12(b); 29 C.F.R. § 1608.1(e).[7]

Title VII also authorizes the EEOC to require state and local government employers to collect, maintain, and regularly report demographic workforce data (e.g., race, sex) by job category. 42 U.S.C. § 2000e-8(c); 29 C.F.R. § 1602.30, et seq. And state and local governments that receive specific grant funds are *required* to conduct utilization analyses, establish plans for eliminating underutilization, and report the same to the DOJ every two

---

[7] Statewide statutory frameworks requiring agency-level equal employment or affirmative action plans are common across jurisdictions and administrations of differing political composition. *See, e.g.*, Iowa Code § 19B.11; Fla. Stat. § 110.112; N.Y. Exec. Law § 310 et seq.; 20 ILCS 415/8b; Tex. Lab. Code § 21.556; Wash. Rev. Code § 41.06.150. California's Constitution bans race- and sex-based affirmative action programs in state employment. *See* Cal. Const. art. I, § 31. But like Minnesota's Program, California state law still requires state agencies to collect and analyze demographic data to identify potential discriminatory barriers to state employment. Cal. Gov't Code §§ 19792(h);19793; 19798.

years.[8] Minnesota's affirmative action laws are indistinguishable from these federal analogs, which remain in full effect.

## III.    INVESTIGATION AND PRE-SUIT PROCEEDINGS.

On July 10, 2025, the DOJ served Minnesota with a Notice of Investigation, stating it had "reason to believe" that DHS's then-forthcoming (and now-defunct) Hiring Justification Policy violates Title VII.[9] The DOJ expressed that it had "not reached any conclusions," invited Minnesota's cooperation, committed to "consider all relevant information," and asked for Minnesota's "assistance in helping to identify what that might be." (Pladson Decl. Ex. A.) That all turned out to be lip service.

### A.    DOJ's Request for Information – July 29, 2025.

In late July, the DOJ served Minnesota its only information request in the investigation.[10] Identifying the relevant time period as January 1, 2023 to the present, the DOJ made thirty-two demands that underscored the gap between the claimed statewide "pattern-or-practice" in the Complaint and what the DOJ actually investigated. (Pladson Decl. Ex. B.) The DOJ's requests fell in three buckets. The first five sought background information about Minnesota's general compliance with nondiscrimination laws and

---

[8] *See* 28 C.F.R. pt. 42. This regulation is still in effect, but the DOJ "temporarily" paused collection of this information a year ago. *See* DOJ, Office of Justice Programs, EEOP Notice, March 11, 2025, *available at* https://perma.cc/SJ9W-SAEA.

[9] *See* Letter from Harmeet K. Dhillon to Keith Ellison, dated July 10, 2025, annexed as Exhibit A to the Declaration of Nick Pladson in Support of Defendants' Motion for a More Definite Statement ("Pladson Decl.").

[10] *See* Letter from Liza Zamd to Keith Ellison, et al., dated July 29, 2025, annexed as Exhibit B to the Pladson Decl.

evidence of historical discrimination in state employment. (*Id.*) The final five requests targeted a single employee of a small state agency. (*Id.*) The remaining twenty-two requests homed in on DHS but focused primarily (and confusingly) on an older DHS hiring policy, not the Hiring Justification Policy identified in the Notice of Investigation. (*Id.* at n.3.) In fact, the DOJ never inquired about the DHS Hiring Justification Policy during its cursory investigation.

## B.    Minnesota Responds and Requests a Meeting – August 28, 2025.

Minnesota responded on August 28, 2025, within the DOJ's deadline, by providing written answers to questions and producing copies of applicable laws, regulations, policies, procedures, training materials and guidelines for the creation and operation of Plans; cabinet-level agency Plans; and sundry other hiring-related materials (e.g., template forms, checklists, a flowchart, and general guidance documents).[11] In all, Minnesota produced hundreds of pages of records, including many additional DHS policies. And Minnesota explained that its Program is specifically "structured around" EEOC's affirmative action regulations.

Because the DOJ's requests appeared to veer from its Notice of Investigation, Minnesota requested a meeting to clarify the investigation's target and scope and committed to providing even more information once clarification was received.[12]

---

[11] *See* Letter from Nick Pladson to Liza Zamd, dated August 28, 2025, annexed as <u>Exhibit C</u> to the Pladson Decl; Pladson Decl. ¶ 6.

[12] Pladson Decl. Ex. C, ¶ 3.

Minnesota also explained that the Hiring Justification Policy was unique to DHS; it was not used at any other agency.

Beyond notifying Minnesota that the investigation had been reassigned from a career attorney to a recent hire, the DOJ did not respond to Minnesota's request to meet. Minnesota would not hear from the DOJ again for over four months.

### C.    Policy Revisions During the Investigation.

Minnesota used the investigation period to review and unify relevant statewide hiring protocols. On October 20, 2025, MMB revised its statewide recruitment and selection policy to implement a pre-hire documentation process applicable to *all* executive-branch agencies, including DHS.[13] This revision superseded all inconsistent agency-level policies. DHS determined that MMB's revised policy abrogated its Hiring Justification Policy and withdrew it.[14]

Per this unified process, hiring managers in all agencies must document why a finalist is the best-qualified candidate for a position, focusing on job-related factors like work experience, required training or licensure, and knowledge, skills, and abilities.[15] Agencies are required to apply this policy as-is unless explicitly exempted by MMB. The

---

[13] *See* MMB HR/LR Policy #1434 – Recruitment and Selection, dated October 20, 2025, at Section VII, annexed as <u>Exhibit A</u> to the Declaration of Richard Nymoen ("Nymoen Decl.")

[14] Nymoen Decl., ¶ 5.

[15] Nymoen Decl., Ex. A, p.8.

documentation requirement applies to every covered hiring decision—not just for job classifications with identified underutilization.

This unified documentation process simultaneously supplies the information necessary for Plan-based auditing and preemployment review contemplated by Minn. R. 3905.0400, subp. 1(I). If an agency's Plan calls for review of hiring decisions in particular goal units, the relevant job-related rationale has already been captured in the ordinary course of the hiring process. Documentation collected under MMB's policy thus satisfies any Plan auditing components. The DOJ would have learned this—before filing suit—had it had accepted Minnesota's invitation to meet last fall.

### D.    Closure Notice, Certification, and an Ultimatum—January 8, 2026.

On January 8, 2026, the DOJ concluded that "Minnesota has maintained, and continues to maintain, discriminatory policies and practices" to accomplish "race- and sex-balancing goals" for its workforce.[16] That same day, the Attorney General authorized this lawsuit as a matter of "general public importance" and signed a request for a three-judge panel.[17] When the DOJ notified Minnesota of these developments, it demanded that Minnesota agree to a consent decree within six days or face suit.[18] Minnesota posed several

---

[16] (Doc. 1, ¶¶ 63, 72); *See* Letter from Harmeet K. Dhillon to Keith Ellison, dated January 8, 2026, annexed as <u>Exhibit D</u> to the Pladson Decl.; *see also* Email from Greta Gieseke to Nick Pladson, dated January 8, 2026 at 3:29 p.m., annexed as <u>Exhibit E</u> to the Pladson Decl., p.7.

[17] (Doc. 1-1.)

[18] Pladson Decl., Ex. D, p.3.

clarifying questions about the findings and requested written consent decree terms to review, but no answers were given and no terms were provided.[19] Consequently, Minnesota could not reasonably accept the DOJ's vague demands and formally rejected their proposal on January 13, 2026.[20] Minnesota remained willing to continue the dialogue, but the DOJ filed suit the next day.

## IV.    THE COMPLAINT.[21]

The DOJ's Complaint opens stridently: "Minnesota law *requires* the state to discriminate against its current and prospective employees on the basis of race and sex." (Compl. at 1, emphasis added.) But beyond its introductory assertions, the Complaint offers virtually no specifics about this "requirement," or why the extraordinary relief it seeks— enjoining Minnesota statutes, MMB rules, the statewide Program, and unspecified agency Plans—is warranted or even administrable. (*Id.* at ¶¶ 1-11, 20-44.) The Complaint pleads two counts: disparate treatment (Count I) and discriminatory classification (Count II).

---

[19] Pladson Decl., Ex. E, p.3–6.

[20] Pladson Decl., Ex. E, p.2.

[21] Announcing this lawsuit, the United States Attorney for the District of Minnesota linked it to unrelated allegations that "state officials let criminals brazenly walk off with over a billion taxpayer dollars," before asserting that those "same officials" are "abusing their power" in administering the Program. *See* Press Release, "United States Department of Justice Files Lawsuit Against Minnesota's 'Affirmative Action' Regime," U.S. Department of Justice (Jan. 14, 2026), annexed as Exhibit F to the Pladson Decl. The Program, and its underlying statutory framework, have existed in Minnesota for 45 years. It has no connection to any alleged fraud in any public benefit program.

Cumulatively, the DOJ contends that the Program mandates a "pattern or practice" of treating white males less favorably by:

- granting "preferences" to females and persons of color (Compl. ¶ 57);

- compelling discriminatory "staffing and personnel decisions" (*id.* at ¶¶ 58, 66);

- requiring that the Program and Plans establish "goals" (*id.* at ¶ 59);

- directing agencies to "justify" hiring non-diverse candidates (*id.* at ¶ 60);

- defining "protected groups" (*id.* at ¶ 65); and

- obligating agencies to conduct underutilization analyses (*id.* at ¶¶ 67, 69).[22]

On these conclusory allegations, DOJ seeks an order declaring that Minnesota has violated Title VII and enjoining it from continuing its allegedly violative practices, requests "equitable relief" for applicants and employees who were allegedly disadvantaged, and seeks to terminate or demote current staff who benefited from the Program. (*Id.* at 16)

Faced with this paucity of factual content, Minnesota is expected to draft an answer on behalf of Minnesota's 20 departments of the state,[23] 5 constitutional offices,[24] and at least 285 boards and commissions.[25] (Compl. at 16.)

---

[22] The Complaint's only concrete example of a discriminatory "standard operating procedure" is DHS's obsolete Hiring Justification Policy. (Compl. ¶¶ 45–52.) But even here, the DOJ fails to plead how that policy treats or classifies applicants or employees discriminatorily. (*Id.*)

[23] Minn. Stat. § 15.01.

[24] Minn. Const. art. V, § 1.

[25] *See* State Agencies, Boards, Commissions, State of Minnesota, *available at* https://perma.cc/2DKK-HC3G.

## ARGUMENT

This motion is about definition, not dismissal. Because this is a Rule 12(e) motion, the question is not whether the Complaint states a claim, but whether it states one with sufficient clarity. First, Minnesota explains why Rule 12(e) applies in this posture. Second, it identifies the specific ways the Complaint is too vague and indeterminate to permit a responsive pleading. Third, it describes the limited clarification required to frame the issues for orderly litigation.

## I.    LEGAL STANDARD.

Rule 12(e) permits a more definite statement when a pleading is "so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e).[26] It applies when a defendant "cannot determine from the complaint what the issues are to which it must respond[,]" *Mack v. Equifax Inf. Servs. LLC*, No. 20-cv-557 (PJS/KMM), 2020 WL 3052091, at *2 (D. Minn. May 11, 2020) *adopted by* 2020 WL 3048017 (D. Minn. June 8, 2020), and "promote[s] judicial economy and efficiency" by clarifying the challenged conduct early, enabling focused discovery and efficient case management. *Martin v. Brott*, No. 24-cv-964 (PJS/ECW), 2025 WL 1687834, at *2 (D. Minn. May 16, 2025) (collecting cases), *adopted by* 2025 WL 1685769 (D. Minn. June 16, 2025). A

---

[26] Minnesota submits declarations and exhibits to supply the factual and regulatory context the Complaint omits—including the scope of the DOJ's investigation and the governing statutes, rules, and policies it purports to challenge—so that the alleged statewide practice can be understood and properly defined. The Court may consider these materials outside the pleadings in adjudicating this motion. *See* 5C Wright & Miller, Fed. Prac. & Proc. Civ. § 1378 (3d ed.) (explaining that affidavits and extrinsic materials can assist in delineating how a pleading is vague or ambiguous).

pleading is too vague if "the court or the parties have to speculate about the nature of the claims" or "frame [the] claims for the pleading party[.]" *TranSurety, LLC v. Cardot*, No. 08-5746 (JRT/JJG), 2009 WL 10694760, at *1 (D. Minn. Apr. 24, 2009) (citation omitted).

In Section 707 cases, precision is paramount. Congress requires that such actions be "in every way expedited." 42 U.S.C. § 2000e-6(b). Courts have therefore required the government to "supplement[] the allegations of fact" under Rule 12(e) so that defendants can identify defenses and cases can be managed efficiently. *See EEOC v. Cont'l Oil Co.,* 393 F. Supp. 167, 172 (D. Colo. 1975). Put differently, Rule 12(e) eliminates "synthetic issues" and brings the "marrow" of the dispute "frankly into the open." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 503, 512 (2002).

## II. TITLE VII DEMANDS IDENTIFICATION OF DISCRIMINATORY EMPLOYMENT PRACTICES, NOT ABSTRACT POLICY ACCUSATIONS.

Section 707 requires proof that discrimination is the employer's "standard operating procedure[,] the regular rather than the unusual practice[.]" *Teamsters,* 431 U.S. at 336 (citation omitted). Title VII targets "discriminatory employment practices, not an abstract policy of discrimination." *Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 877 (1984) (discussing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).[27] When a discrimination claim sweeps broadly across a large employer, implicating thousands of employment decisions, there must be "some glue holding the alleged reasons for all those

---

[27] *Falcon* addressed the intersection of Title VII and Rule 23, but its core warning is transferable: pleading the existence of an unspecified "policy" leaves the defendant guessing and invites discovery to do the work of pleading.

decisions together," a common mechanism or practice that allegedly drives the unlawful outcomes. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011). This ensures that a "pattern or practice" is tethered to a defined "employment practice" rather than a non-justiciable, abstract "policy of discrimination." *Cooper*, 467 U.S. at 877–78 (citing *Falcon*, 457 U.S. at 157–58, n.15.)

Courts thus require pattern-or-practice pleadings to provide definitional boundaries—"the time period at issue, the alleged perpetrator of the discrimination and the alleged discriminatory conduct"—because these particulars give fair notice and establish reasonable parameters for discovery. *EEOC v. PMT Corp.*, 40 F. Supp. 3d 1122, 1127, 1129–30 (D. Minn. 2014) (finding EEOC's pleading sufficient when it identified the time period, location, practice, unlawful conduct, and affected class); *see also EEOC v. Ruby Tuesday, Inc.,* 819 F. Supp. 2d 587, 592–93 (W.D. Pa. 2013) (requiring a more definite statement where "there is no recitation of any factual basis, plausible or otherwise, for the 'pattern and practice' claims alleged, whether based on an anecdotal, testimonial, documentary or statistical foundation"); *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, No. CV F 08-129 LJO DLB, 2008 WL 850250, at *5 (E.D. Cal. Mar. 28, 2008) (granting Rule 12(e) motion where "policy, pattern, and practice allegation [was] ambiguous").

The Complaint does not do that. Of the 72 numbered paragraphs, only 17 can plausibly be construed as bona fide factual allegations.[28] Of these 17 factual allegations, 15 simply quote MMB or DHS policy documents.[29]

Only two factual allegations describe what DOJ views as a statewide pattern or practice of disparate treatment discrimination:

- "Minnesota requires its hiring managers to jump through additional hoops to hire employees with disfavored skin colors or sex chromosomes." (Compl. ¶ 34.)

- Minnesota "has adopted a universal regime for all agencies premised on a lack of numerical congruence between the demographic data in a given agency work force and the relevant civilian labor market." (*Id.* at ¶ 54.)[30]

But the plain language of Minnesota's affirmative action laws, rules, and policies reflect a dynamic system, not a monolith. The Program operates through individual, agency- and job-specific underutilization analyses—not a statewide system of "race- and sex-balancing goals." (Compl. ¶ 69.) The Complaint seems to recognize this. (*Id.* at ¶ 67.) The Program's response to underutilization is *not* preferential selection, but "outreach and recruitment" to "increase the pool of qualified applicants," recognizing that potential

---

[28] *See* (Compl., ¶¶ 21, 22, 28, 31–35, 38, 45–47, 49–52, 54.)

[29] *See* (Compl., ¶¶ 21, 22, 28, 31–33, 35, 38, 45–47, 49–52.)

[30] The EEOC encourages employers to conduct these analyses and "take affirmative action based on an analysis which reveals facts constituting actual or potential adverse impact[.]" 29 C.F.R. §§ 1608.3(a); 1608.4; 1608.7 (permitting affirmative action plans adopted under state law); *see also* Andrea R. Lucas, *The Legality of DEI Following Students for Fair Admissions*, 38 ABA J. Lab. & Emp. L. 363, 369 (2025) (Chair of the EEOC explaining that "a company's numbers typically should be compared against the labor market for that particular company and job position in question.")

barriers to recruitment may tend to screen out otherwise qualified applicants.[31] Indeed, "underutilization is NOT an identification of discrimination."[32] Plan "goals are NOT" "[q]uotas," and Plans are not "[a] justification to extend preference to any individual on the basis of any protected characteristics."[33] The Complaint also fails to reconcile its allegation that Minnesota unlawfully classifies applicants and employees by race and sex, (Compl. ¶ 65), with federal law requirements that Minnesota do just that. *See* 42 U.S.C. § 2000e-8(c); 29 C.F.R. § 1602.30, et seq.

This dearth of predicate facts bleeds through to the DOJ's theories of liability and leaves Minnesota guessing as to how the DOJ believes it has violated Title VII. These theories further cement the need for a more definite statement. When a complaint incorporates documents that contradict its legal conclusions, clarification is required before the defendant can frame a response.

A.    **<u>First Theory</u>: The Program Directly Impels Discrimination in Hiring (Compl. ¶¶ 58, 65-66).**

The DOJ's boldest contention is its conclusion that the Program is facially discriminatory because it "requires" Minnesota to "make[] staffing and personnel decisions...based on" race and sex. (Compl. ¶¶ 13, 58, 65-66.) If this theory is facial—that the Program's statutory foundation itself mandates protected-trait selection—the DOJ must

---

[31] *Affirmative Action Data Analysis Training*, at 8, 22, 28.

[32] *Id.* at 21.

[33] *Id.* at 8, 21-22.

identify the statutory provision and explain the mechanism by which it invariably carries out discriminatory employment decisions. But the DOJ's Complaint does not describe a system of self-executing discrimination at all. That mismatch matters because it leaves Minnesota, and this Court, to speculate what alleged unlawful "employment practice" the DOJ is challenging.

**B.    Second Theory: The Program's Goal-Setting Requirement Impels Discrimination. (Compl. ¶ 59).**

The Complaint suggests a second theory—that Minnesota's goal-setting requirement itself "impels" unlawful disparate treatment by using goals as a proxy for protected-trait selection requirements. (Compl. ¶ 59.) But how? The Complaint identifies no goal that discriminates based on race or sex, or even a single example of how a goal yielded disparate treatment discrimination. And the materials incorporated in the Complaint contradict the DOJ's proxy theory. As pleaded, then, the Complaint leaves Minnesota guessing how the DOJ believes Program and Plan goals violate Title VII.

**C.    Third Theory: Underutilization Analyses Are Per Se Illegal (Compl. ¶¶ 67–69).**

Relatedly, the DOJ's third theory seems to be that underutilization analyses *ipso facto* violate Title VII both by illegally classifying applicants and employees and producing disparate treatment discrimination. (Compl. ¶¶ 67–69.) Beyond that the EEOC and DOJ expressly countenance (and sometimes demand) underutilization analyses—which the DOJ astonishingly elides—the Complaint again pleads no facts connecting the dots.[34] By

---

[34] *See* Section II & n. 8, 30, *supra*.

challenging underutilization analyses abstractly, the DOJ once more leaves Minnesota unable to admit or deny a concrete "employment practice."

D.   <u>Fourth Theory</u>: **Hiring Non-Underrepresented Applicants Requires Additional Justification (Compl. ¶ 60).**

Finally, the Complaint appears to advance a fourth theory, that DHS's abrogated Hiring Justification Policy violates Title VII by requiring DHS hiring managers to justify hiring applicants who are not underrepresented in the labor market for a particular job. (Compl. ¶ 60.) Setting aside the fact that the Hiring Justification Policy identified by DOJ only applied to DHS and was in effect for only two months, the Complaint fails to explain how it caused hiring managers at DHS to discriminate in favor of underrepresented candidates—let alone how the policy evinces a pattern or practice of discrimination across the entire executive branch.

* * *

Absent further definition, the Complaint cannot be read as anything more than an attack on Minnesota's executive branch hiring system in gross, as "an abstract policy of discrimination," rather than a challenge to specific "discriminatory employment practices" that Title VII requires. *Cooper*, 467 U.S. at 877. It contains no "glue" adhering the DOJ's pattern or practice claims to a cognizable catalyst of statewide discrimination, *Dukes*, 564 U.S. at 352, which the *Teamsters* proof scheme demands. Minnesota thus seeks a more definite statement under Rule 12(e) now—before discovery begins—because "it is reasonable to require the plaintiff to set forth enough facts for the defendant to determine whether there is a good faith belief that [affirmative] defenses are applicable," and that

purpose "can best be served by supplementing the allegations of fact." *Cont'l Oil Co.*, 393 F. Supp. at 171–72.

### III.    A MORE DEFINITE STATEMENT IS NEEDED FOR THIS CASE TO BE "IN EVERY WAY EXPEDITED."

Compounding the DOJ's pleading failures is Congress's command that this case be "in every way expedited." 42 U.S.C. § 2000e-6(b). Once Minnesota answers, Rule 26(a)(1) will require both sides to identify key custodians and categories of discoverable information. If treated as operative, the Complaint will open the gates to limitless discovery. More than 40,000 employees currently work in Minnesota's executive branch, serving Minnesotans in myriad job classifications across more than 300 unique state government entities.[35] The universe of potential discovery in this case encompasses hundreds-of-thousands of personnel actions at every decision point, from recruitment through offer, promotion, transfer, and layoff.

This Court has emphasized that Rule 12(e) ensures pleadings provide sufficient notice and to prevent discovery from becoming a substitute for defining a claim. In *Eisenach v. Miller–Dwan Med. Ctr.,* 162 F.R.D. 346 (D. Minn. 1995), an employment-discrimination plaintiff alleged "unlawful employment practices" but failed to identify notice-level basics—the protected basis at issue, what employment action(s) were challenged, and when and where the alleged conduct occurred—leaving the defendant

---

[35] *See* First Quarter Report, 2026 Full-Time Equivalent Report, State Reports and Data Portal, Minnesota Department of Management and Budget, *available at* https://perma.cc/54JE-5J9Y.

unable to answer and the court unable to manage the case efficiently. *Id*. at 348–49. This Court required a more definite statement, because even pre-*Iqbal/Twombly* Rule 8 demands a factual "showing," and because postponing those essentials to discovery would invite wasteful, unbounded pretrial activity contrary to Rules 1 and 16. *Id*.

The same case-management concern is implicated here, but on a substantially greater scale. *Eisenach* involved a single employee's claim; the DOJ invokes an extraordinary procedural mechanism to challenge employment practices across Minnesota's entire executive branch. What was necessary to frame discovery in *Eisenach* is indispensable here to prevent statewide litigation from proceeding without defined boundaries.

The DOJ alleges it investigated Minnesota's employment practices, found "reasonable cause" to believe the state is engaged in a sweeping pattern or practice of unlawful discrimination, and invoked Title VII's most extraordinary mechanism. Its attorneys signed the Complaint, certifying under Rule 11 that the allegations have—or will likely have—evidentiary support. If this case is as the DOJ advertises, then identifying the specific challenged practices, the agencies that purportedly used them, the job groupings implicated, and the decision points at which protected traits allegedly altered outcomes should be straightforward.

## REQUESTED REMEDY

Minnesota requests that this Court order the DOJ to file a more definite statement that specifies, at a minimum, each employment practice the DOJ contends violates Title VII, including:

1.    The source of the practice (i.e., statute or rule, a statewide policy, or an agency-level policy or practice);

2.    The agency or agencies that use or used the practice, and when;

3.    How the practice causes or caused discrimination;

4.    Where in the decision-making process the practice causes or caused discrimination;

5.    The job classifications that the practice affects or affected; and

6.    A general outline of the class or class of persons against whom the practice discriminates or discriminated against.

## CONCLUSION

Minnesota seeks basic facts defining the alleged "standard operating procedure" that is a *sine qua non* of a pattern-or-practice claim. Without such facts, Minnesota cannot responsibly admit or deny an operative "employment practice," and the Court cannot supervise proportional discovery on an expedited, three-judge track without allowing discovery to substitute for pleading. This narrow, rule-faithful request is necessary to ensure bounded discovery and orderly adjudication in the extraordinary vehicle DOJ chose.

Dated:  February 27, 2026

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

 s/ Nick Pladson
NICK PLADSON (0388148)
JEFF TIMMERMAN (0352561)
Assistant Attorneys General

PETER J. FARRELL (0393071)
Deputy Solicitor General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 300-7083 (Voice)
(651) 296-7438 (Fax)
Nick.Pladson@ag.state.mn.us
Jeffrey.Timmerman@ag.state.mn.us
Peter.Ferrell@ag.state.mn.us

*ATTORNEYS FOR STATE OF MINNESOTA*

|#6283389-v3