UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 26-cv-273 |
| Plaintiff, | (PJS-RWG-DPM/SGE) |
| vs. | **DEFENDANT'S ANSWER TO** |
| | **PLAINTIFF'S COMPLAINT** |
| State of Minnesota, | |
| Defendant. | |

## ANSWER

Minnesota maintains a merit-based equal employment opportunity framework that uses workforce data to identify potential barriers to equal opportunity, broaden recruitment, document job-related decisions, and preserve nondiscriminatory selection. Minnesota does not make employment decisions because of race, color, national origin, or sex. Nothing in Minnesota's statutes, rules, plans, policies, or practices requires or permits quotas, preferential selection, or any employment decision based on race, color, national origin, or sex.

Except as expressly admitted below, Minnesota denies each allegation in the Complaint, including all allegations in headings, footnotes, exhibits, and the Prayer for Relief.

## RESPONSE TO THE UNNUMBERED INTRODUCTORY ALLEGATIONS

The Complaint's unnumbered introductory paragraphs contain quotations, legal argument, characterizations, and conclusions of law requiring no response. To the extent that facts are alleged, Minnesota denies them.

## INTRODUCTION

1.     "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 208 (2023) (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)). Federal civil rights laws, including Title VII of the Civil Rights Act of 1964, reflect this truth.

**ANSWER:**   Paragraph 1 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits the quoted language appears in the cited Supreme Court decisions and denies the remaining allegations in Paragraph 1.

2.     Under Title VII, it is unlawful for employers to discriminate against, or limit, segregate, or classify in any way that would adversely affect the employment of, current or prospective employees because of their race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1)–(2).

**ANSWER:**   Paragraph 2 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits that 42 U.S.C. §§ 2000e-2(a)(1) and (2) contain prohibitions applicable to covered employers, denies that it has violated those provisions, and denies the remaining allegations in Paragraph 2.

3.     Yet in 1979, the United States Supreme Court "introduce[d] into Title VII a tolerance for the very evil that the law was intended to eradicate," *United Steelworkers of*

*Am. v. Weber*, 443 U.S. 193, 254-55 (1979) (Rehnquist, J., dissenting), and held that Title VII authorizes private employers to adopt "affirmative action plans designed to eliminate conspicuous racial imbalance in traditionally segregated job categories," *id.* at 209.

**ANSWER:**    Paragraph 3 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits that the quoted language appears in the cited United States Supreme Court decision and denies the remaining allegations in Paragraph 3.

4.        Because Title VII's text does not support such an exception to its prohibition of racial discrimination in employment, the Court resorted to Title VII's "spirit" to justify its holding. *Id.* at 201 (quoting *Holy Trinity Church v. United States*, 143 U.S. 457, 459 (1892)).

**ANSWER:**    Paragraph 4 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits that the quoted language appears in the cited United States Supreme Court decision and denies the remaining allegations in Paragraph 4.

5.        Eight years later, the Court extended *Weber* to public employers and sex-based affirmative action. *Johnson v. Transp. Agency, Santa Clara Cnty.*, 480 U.S. 616, 639-42 (1987).

**ANSWER:**    Paragraph 5 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits that the United States Supreme Court decided the cited case and denies the remaining allegations in Paragraph 5.

6.        With that, the Court "complete[d] the process of converting [Title VII] from a guarantee that race or sex will *not* be the basis for employment determinations, to a guarantee that it often *will*." *Id.* at 658 (Scalia, J., dissenting).

3

**ANSWER:**   Paragraph 6 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits that the quoted language appears in the dissent of the cited United States Supreme Court decision and denies the remaining allegations in Paragraph 6.

7.      Diverging from *Weber* and *Johnson*, the Supreme Court has since directed, when interpreting Title VII, that "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. *Only the written word is the law*, and all persons are entitled to its benefit." *Bostock v. Clayton County*, 590 U.S. 644, 653 (2020) (emphasis added).

**ANSWER:**   Paragraph 7 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits that the quoted language appears in the cited United States Supreme Court decision and denies the remaining allegations in Paragraph 7.

8.      "Title VII's 'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656. Under that test, "[s]o long as the plaintiff's sex [or race, color, religion, or national origin] was one but-for cause of [the challenged employment decision], that is enough to trigger the law." *See id.*

**ANSWER:**   Paragraph 8 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits that the quoted language appears in the cited United States Supreme Court decision and denies the remaining allegations in Paragraph 8.

9.      "Employers may not 'fail or refuse to hire or . . . discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" race, color, religion, sex, or national origin. *See id.* at 658 (quoting 42 U.S.C. § 2000e-2(a)(1)) (emphasis omitted). And it does not matter if factors other than race, color, religion, sex, or national origin contributed to the employer's decision. *See id.* at 659.

4

**ANSWER:**    Paragraph 9 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits that the quoted language appears in the cited United States Supreme Court decision and Title VII of the Civil Rights Act of 1964 and denies the remaining allegations in Paragraph 9.

10.    [P]ut differently, if changing the employee's [race, color, religion, sex, or national origin] would have yielded a different choice by the employer—a statutory violation has occurred." *See id.* at 659-60.

**ANSWER:**    Paragraph 10 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits that the quoted language appears in the cited United States Supreme Court decision and denies the remaining allegations in Paragraph 10.

11.    Minnesota laws, enacted around the time that *Weber/Johnson* greenlighted race and sex discrimination under Title VII, demonstrate the consequences of these precedents.

**ANSWER:**    Paragraph 11 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota denies Paragraph 11 and adds that the relevant Minnesota laws were enacted before the United States Supreme Court issued the decisions cited in Paragraph 11 and have been amended many times since. *See* Act of Mar. 28, 1978, ch. 708, § 1, 1978 Minn. Laws 672, 672–74 (originally codified at Minn. Stat. § 43.15 (1978)).

12.    To "eliminate the effects of past and present discrimination, intended or unintended, on the basis of protected group status" in state civil service, Minnesota law requires the adoption of "a statewide affirmative action program," Minn. Stat. § 43A.19, subd. 1(a), and the "consideration of affirmative action goals on all staffing and personnel decisions," Minn. R. 3905.0100.

**ANSWER:**   Paragraph 12 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits Minn. Stat. § 43A.19, subd. 1(a) and Minn. R. 3905.0100 contain the quoted language and denies the remaining allegations in Paragraph 12.

13.    By following this statutory and regulatory affirmative action mandate, Minnesota, as an employer, is engaged in a pattern or practice of resistance to the full enjoyment of rights secured by Title VII, and that pattern or practice is intended to deny prospective and existing state employees the full exercise of Title VII rights. *See* 42 U.S.C. § 2000e-6(a).

**ANSWER:**   Denied.

### JURISDICTION AND VENUE

14.    This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. *See also* Exec. Order No. 12068, 43 Fed. Reg. 28971 (June 30, 1978) ("Providing for Transfer to the Attorney General of Certain Functions Under Section 707 of Title VII of the Civil Rights Act of 1964, as Amended").

**ANSWER:**   Admitted.

15.    This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1345 and 42 U.S.C. § 2000e-6.

**ANSWER:**   Admitted in part and denied in part. Minnesota admits that this Court has jurisdiction of this action under 28 U.S.C. §§ 1331, 1345 and 42 U.S.C. § 2000e-6. Minnesota denies that it has engaged in any unlawful employment practice under Title VII of the Civil Rights Act of 1964 and denies that the United States is entitled to any relief.

16.    Venue for this action is proper in the United States District Court for the District of Minnesota, pursuant to 28 U.S.C. § 1391(b).

**ANSWER:**   Admitted.

17.    Because this case is of general public importance, as certified by the Attorney General of the United States, *see* Ex. A, Plaintiff United States of America respectfully

invokes its right under 42 U.S.C. § 2000e-6(b) to expedited proceedings before a three-judge district court.

**ANSWER:**  Minnesota admits the Attorney General certified this case as one of general public importance and invoked 42 U.S.C. § 2000e-6(b). (Dkt. 1-1.) Minnesota denies that the certification was supported by any unlawful employment practice, denies that the United States has fulfilled all conditions precedent to this suit, denies that the United States conducted a good faith pre-suit investigation, denies that this case is of general public importance, and denies that the United States is entitled to any relief.

## PARTIES

18.    Plaintiff United States of America (United States) brings this action under Section 707 of Title VII, as amended, 42 U.S.C. § 2000e-6.

**ANSWER:**  Admitted.

19.    Defendant State of Minnesota (Minnesota) is a "person," as defined by 42 U.S.C. § 2000e(a), and an "employer," as defined by 42 U.S.C. § 2000e(b).

**ANSWER:**  Admitted.

## FACTS

### Minnesota's Statutory and Regulatory Affirmative Action Regime

20.    For the stated purposes of "assur[ing] that positions in the executive branch of the civil service are equally accessible to all qualified persons, and . . . eliminat[ing] the effects of past and present discrimination," Minnesota law mandates a statewide affirmative action program for state civil service, Minn. Stat. § 43A.19, subd. 1(a), and requires "consideration of affirmative action goals on *all* staffing and personnel decisions," Minn. R. 3905.0100 (emphasis added).

**ANSWER:**  Paragraph 20 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits Minn. Stat. § 43A.19, subd. 1(a) and Minn. R. 3905.0100 contain the quoted language.

7

Minnesota denies that those provisions require or authorize discrimination, quotas, preferences, or any employment decision based on race, color, national origin, or sex.

21.     Minnesota Management and Budget (MMB) is the state agency charged with overseeing the statewide affirmative action program. *Affirmative Action*, Minnesota Management & Budget, https://perma.cc/YT7M-S9YR.

**ANSWER:**   Admitted.

22.     MMB describes "Affirmative Action" as "[p]ositive steps to get qualified individuals who were historically discriminated in employment"; quantitative and reactive; and focused, *inter alia*, on race and sex. *2022-2024 Affirmative Action Data Analysis Training*, Minnesota Management & Budget, 7, https://perma.cc/BN5W-VKCH.

**ANSWER:**   Minnesota admits that the entire MMB training presentation *2022-2024 Affirmative Action Data Analysis Training* cited in Paragraph 22 is authentic and contains some of the quoted language. Minnesota denies the United States' characterization of the presentation and denies the remaining allegations in Paragraph 22.

23.     The Commissioner of MMB must "adopt and periodically revise . . . a statewide affirmative action program." Minn. Stat. § 43A.19, subd. 1(a); *see also id.* § 43A.02, subd. 13.

**ANSWER:**   Admitted.

24.     The statewide affirmative action program must include, *inter alia*, "objectives, goals, and policies"; "procedures, standards, and assumptions to be used by agencies in the preparation of agency affirmative action plans, including methods by which goals and timetables are established"; and "requirements for annual objectives and submission of affirmative action progress reports from heads of agencies." Minn. Stat. § 43A.19, subd. 1(a).

**ANSWER:**   Admitted.

25.     The Commissioner must "establish statewide affirmative action goals" based on (1) "the percentage of members of each protected class in the recruiting area population who have the necessary skills"; and (2) "the availability for promotion or transfer of current employees who are members of protected classes." Minn. Stat. § 43A.19, subd. 1(b)(1)-(2).

**ANSWER:** Paragraph 25 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits Minn. Stat. § 43A.19, subd. 1(b)(1)-(2) contain the language in Paragraph 25. Minnesota adds that the allegations in Paragraph 25 omit the other factors that the Commissioner considers in establishing statewide affirmative action goals provided under Minn. Stat. § 43A.19, subd. 1(c) and Minn. R. 3905.0600, and on that basis denies them.

26.    "Agency heads" likewise shall establish numerical goals by protected group. Minn. R. 3905.0600, subp. 4-5. Goals are determined by comparing the protected-group composition of the agency unit work force to the composition of the relevant civilian labor market. *Id.* at subp. 5.

**ANSWER:** Paragraph 26 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits that Minn. R. 3905.0600, subps. 4–5, addresses numerical goals and the basis for goals. Minnesota denies that numerical goals are established for all agencies, all subdivisions, or all job classifications and further denies that such goals are quotas, mandatory selection rates, or requirements to select, reject, advance, delay, or otherwise treat any applicant or employee differently because of race, color, national origin, or sex. Minnesota also denies Paragraph 26 to the extent that it conflates the determination of underutilization with the establishment of goals. Under the rule, goals are established only where underutilization exists.

27.    If the comparison shows that a unit underutilizes a protected group, the agency head shall establish a goal for that protected group in that unit, *id.*, and a timetable for meeting that goal, *id.* at subp. 6.

**ANSWER:**   Paragraph 27 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits that Minn. R. 3905.0600 addresses establishment of goals and timetables where underutilization exists in a particular job classification at a particular agency. Minnesota denies that numerical goals are established for all agencies, all subdivisions, or all job classifications and further denies that such goals are quotas, mandatory selection rates, or requirements to select, reject, advance, delay, or otherwise treat any applicant or employee differently because of race, color, national origin, or sex.

28.    All Minnesota executive agencies are statutorily required to classify employees and applicants as either members or non-members of a protected class or group. *See Monitoring the Hiring Process*, Minnesota Management & Budget, https://perma.cc/XE5U-YNKH (requiring tracking of "underutilization of a protected group in a job category").

**ANSWER:**  Paragraph 28 states legal conclusions and characterizations to which no response is required, and the cited webpage speaks for itself. To the extent a response is required, Minnesota admits that certain procedures use aggregate workforce data reflecting the race, national origin, and sex of applicants and employees who voluntarily self-identify. Minnesota states that, consistent with federal and state law, it does not require applicants and employees to disclose those characteristics. Minnesota denies that it classifies employees or applicants as members or non-members of a protected class for purposes of any employment decision, and denies that any such procedures limit, segregate, or classify employees or applicants within the meaning of Section 703(a)(2) or otherwise require or permit any employment decision because of race, color, national origin, or sex. Minnesota denies the remaining allegations of Paragraph 28.

10

29.     The protected groups or classes under Minnesota law are "females, persons with disabilities, and members of the following minorities: Black, Hispanic, Asian or Pacific Islander, and American Indian or Alaskan native." Minn. Stat. § 43A.02, subd. 33.

**ANSWER:**   Paragraph 29 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits that Minn. Stat. § 43A.02, subd. 33 contains the quoted language.

30.     Given this definition of who is "protected," Minnesota law necessarily requires classification of employees and potential employees by race and sex. Absent such classification, Minnesota could not develop and implement its statutorily mandated affirmative action policies.

**ANSWER:**   Paragraph 30 states a legal conclusion to which no response is required. To the extent a response is required, Minnesota admits that its statewide framework and federal reporting obligations involve identifying workforce demographics in the aggregate, drawn from the voluntary self-identification by applicants and employees, and states that this data collection and reporting are required or authorized by 42 U.S.C. § 2000e-8(c) and 29 C.F.R. part 1602. Minnesota denies that aggregate demographic identification constitutes classification of any individual by race or sex, denies that it classifies any individual in making or as a basis for any employment decision, and denies the remaining allegations of Paragraph 30.

31.     MMB also instructs agencies to calculate "Final Availability," also known as, "What We Should Look Like." This is "[a]n estimate percentage of qualified females, racial/ethnic minorities, or individuals with disabilities available for employment in the relevant labor market who are available . . . in a given job category." It is "used to identify what the qualified workforce in the job category [is] supposed to look like." *2022-2024 Affirmative Action Data Analysis Training*, *supra* ¶ 22, at 15.

**ANSWER:**   Admitted in part and denied in part. Minnesota admits that the MMB training presentation *2022-2024 Affirmative Action Data Analysis Training* cited in Paragraph 22 is

authentic and contains the quoted language, to the extent accurately quoted. Minnesota denies the United States' characterization of the presentation and denies the remaining allegations in Paragraph 31.

32.    Final availability is "compared to the job category headcounts to determine the existence of underutilization." *Id.*

**ANSWER:**    Admitted in part and denied in part. Minnesota admits that the MMB training presentation *2022-2024 Affirmative Action Data Analysis Training* identified in Paragraph 22 contains the quoted language, to the extent accurately quoted, and that final availability figures are used in underutilization analysis. Minnesota denies the United States' characterization of the presentation and denies the remaining allegations in Paragraph 32.

33.    If an agency does not meet its affirmative action hiring goals—meaning "there is an underutilization of a protected group in a job category"—the hiring manager must "justify its nonaffirmative action hires" by submitting a Pre-Hire Justification Form (PHJ) that "explain[s] the reason for hiring a non-affirmative candidate." Minn. Stat. § 43A.191, subd. 3(c); *Monitoring the Hiring Process*, *supra* ¶ 28.

**ANSWER:**    Paragraph 33 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits that the referenced version of the *Monitoring the Hiring Process* website contains the language in the first and third quotes in Paragraph 33, and that Minn. Stat. § 43A.191, subd. 3(c) contains the language in the second quote in Paragraph 33. Minnesota denies the remaining allegations in Paragraph 33 and states further that these procedures do not require or permit discrimination, quotas, preferences, or any employment decision based on race, color, national origin, or sex.

34.    Put otherwise, Minnesota requires its hiring managers to jump through additional hoops to hire employees with disfavored skin colors or sex chromosomes.

**ANSWER:**  Denied.

35.    State agencies analyze PHJ forms and "may determine [that] the minimum qualifications need to change or [that] the agency needs to recruit differently for this position." *Monitoring the Hiring Process*, *supra* ¶ 28.

**ANSWER:**  Admitted in part and denied in part. Minnesota admits that the referenced version of the *Monitoring the Hiring Process* website contains the language quoted in Paragraph 35. Minnesota denies the remaining allegations in Paragraph 35 and states further that these procedures do not require or permit discrimination, quotas, preferences, or any employment decision based on race, color, national origin, or sex.

36.    Minnesota's statutes, rules, and policies therefore are intended to require, and do require, agencies to balance the race and sex of their work forces with the relevant civilian labor markets. Minn. R. 3905.0600, subp. 5 ("The [numerical employment] goals must be based on a comparison of the composition of the agency or agency subdivision work force with the composition of the relevant civilian labor force in an identified labor market area.").

**ANSWER:**  Admitted in part and denied in part. Minnesota admits that Minn. R. 3905.0600, subp. 5, contains the quoted language, to the extent accurately quoted, and that availability analysis compares agency workforce composition with the relevant civilian labor force to determine whether underutilization exists. Minnesota denies that its statutes, rules, or policies are intended to require, or do require, agencies to balance the race or sex of their workforces and denies the remaining allegations in Paragraph 36.

37.    Each agency must also "prepare and implement an agency affirmative action plan" in accordance with statutory requirements and rules promulgated thereunder. Minn. Stat. § 43A.191, subd. 2(a).

**ANSWER:**  Admitted.

38.    MMB supplies agencies with templates and other resources to prepare and implement these plans. *See Affirmative Action Resources*, Minnesota Management & Budget, https://perma.cc/2NT4-G9LZ.

**ANSWER:**   Admitted in part and denied in part. Minnesota admits that the linked Affirmative Action Resources webpage contained certain templates and resources for agency affirmative action plans as of the date the link was captured. Minnesota denies that these resources are comprehensive, mandatory for all agencies, or reflect all prior or current versions of those documents, and on that basis denies the remaining allegations in Paragraph 38.

39.    For agencies with 25 or more employees, the plan must "identify and describe methods for developing programs and program objectives designed to meet affirmative action goals" and "describe methods of auditing, evaluating, and reporting program success, including a procedure that requires a preemployment review of all hiring decisions for goal units with unmet affirmative action goals and preview of all layoff decisions to determine their effect on agencies' affirmative action goals and timetables." Minn. R. 3905.0400, subp. 1(H)-(I).

**ANSWER:**   Paragraph 39 contains legal conclusions and the arguments of counsel to which no response is required. To the extent that a response is required, Minnesota admits that Minn. R. 3905.0400, subp. 1(H)-(I) contains the quoted language and denies the remaining allegations in Paragraph 39.

40.    For agencies with less than 25 employees, the plan must "state the agency head's objective to hire members of protected groups when vacancies occur if an apparent underutilization of protected group members exists in the agency work force." Minn. R. 3905.0400, subp. 2(B).

**ANSWER:**   Paragraph 40 contains legal conclusions and the arguments of counsel to which no response is required. To the extent that a response is required, Minnesota admits

14

that Minn. R. 3905.0400, subp. 2(B) contains the quoted language and denies the remaining allegations in Paragraph 40.

41. The Commissioner must audit each agency annually "to determine the rate of compliance with affirmative action requirements," and if an agency "fails to meet any of its affirmative action requirements for two consecutive years," the Commissioner must report the findings to the governor. Minn. Stat. § 43A.191, subd. 3(a).

**ANSWER:** Paragraph 41 contains legal conclusions and the arguments of counsel to which no response is required. To the extent that a response is required, Minnesota admits that Minn. Stat. § 43A.191, subd. 3(a) contains the quoted language and denies the remaining allegations in Paragraph 41.

42. An agency not in compliance with affirmative action requirements must "identify methods and programs to improve performance, to reallocate resources internally in order to increase support for affirmative action programs, and to submit resource reallocation proposals to the commissioner for approval." Minn. Stat. § 43A.191, subd. 3(f).

**ANSWER:** Paragraph 42 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits Minn. Stat. § 43A.191, subd. 3(f) contains the quoted language and denies the remaining allegations.

43. Minnesota law also contemplates incentives for meeting affirmative action goals and requirements: "The commissioner shall establish a program to recognize an agency that has made significant and measurable progress in implementing an affirmative action plan." Minn. Stat. § 43A.191, subd. 3(g).

**ANSWER:** Paragraph 43 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits Minn. Stat. § 43A.191, subd. 3(g) contains the quoted language and denies the remaining allegations.

44.     Agencies are "encouraged to develop other innovative ways to promote awareness, acceptance, and appreciation for diversity and affirmative action. These innovations will be considered when evaluating an agency's compliance" with affirmative action requirements. Minn. Stat. § 43A.191, subd. 3(e).

**ANSWER:**   Paragraph 44 contains legal conclusions and arguments of counsel to which no response is required. To the extent that any response is required, Minnesota admits Minn. Stat. § 43A.191, subd. 3(e) contains the quoted language and denies the remaining allegations.

### Minnesota Department of Human Services

45.     The Minnesota Department of Human Services' (DHS) Hiring Justification Policy, No. 4100.250 (DHS Policy) provides an example of how Minnesota discriminates against its employees, in violation of Title VII, under its statutory and regulatory affirmative action regime. *See* Ex. B.

**ANSWER:**   Minnesota admits that Complaint Exhibit B is an authentic copy of DHS Policy No. 4100.250, which applied only to DHS and was in effect from August 12, 2025 until it was superseded by a statewide policy on October 20, 2025 (Dkt. 1-2; Dkt. 19, ¶¶ 3–5.) Minnesota denies that the DHS Policy required or permitted any employment decision based on race, color, national origin, or sex, and denies the remaining allegations in Paragraph 45.

46.     The DHS Policy lists Minnesota Statutes, Chapter 43A; and Minnesota Rules, Chapter 3905, as its express authority. *Id.* at 1.

**ANSWER:**   Minnesota admits that the DHS Policy contains references to Minnesota law, denies that the DHS Policy is required by Minnesota law, and denies the remaining allegations in Paragraph 46.

16

47.    The DHS Policy's stated purpose is "to ensure DHS meets affirmative action responsibilities to comply with state statutes and [to] increase the diversity of its workforce to reflect and effectively serve its client base." *Id.*

**ANSWER:**    Minnesota admits that the referenced version of the DHS Policy contains the language quoted in Paragraph 47 and denies the remaining allegations.

48.    The DHS Policy is consistent with Minnesota's statutory and regulatory affirmative action regime, detailed in paragraphs 20-44, *supra*.

**ANSWER:**    Paragraph 48 contains legal conclusions and arguments of counsel to which no response is required. To the extent a response is required, Minnesota denies that Minn. Stat. §§ 43A.19 and 43A.191 or Minn. R. ch. 3905 required, compelled, or dictated the DHS Policy or its procedures, and denies that the DHS Policy is part of or an example of the statewide framework alleged in Paragraphs 20-44. Minnesota further denies that the DHS Policy or the framework alleged in Paragraphs 20-44 violates Title VII. This denial is not an acknowledgment that the now-superseded, agency-specific DHS Policy was contrary to or in violation of Minnesota law, an issue immaterial to this facial challenge to Minnesota's statutes and rules.

49.    Under the DHS Policy, "[h]iring supervisors must provide a hiring justification when seeking to hire a non-underrepresented candidate when hiring for a vacancy in a job category with underrepresentation." Ex. B at 1.

**ANSWER:**    Minnesota admits that the referenced version of the DHS Policy contains the language quoted in Paragraph 49 and denies the remaining allegations.

50.    The DHS Policy prohibits hiring supervisors from "mak[ing] an offer of employment to a non-underrepresented candidate for vacancies in job categories with underrepresentation, before a hiring justification is approved by DHS Equal Opportunity and Access Division[.]" *Id.* at 3.

17

**ANSWER:** Minnesota admits that the referenced version of the DHS Policy contains some of the language quoted in Paragraph 50 and states that under the same policy, hiring justifications were reviewed and approved based on posted qualifications and objective standards and selection decisions were required to be based on posted qualifications. Minnesota denies the remaining allegations in Paragraph 50.

51.    A hiring supervisor must offer interviews to at least three underrepresented candidates if the interview pool contains three or more underrepresented candidates. *Id.*

**ANSWER:** Minnesota admits that the referenced version of the DHS Policy contains the provision described in Paragraph 51 and denies the remaining allegations.

52.    "Underrepresented" means that the full-time equivalent "representation of one or more protected groups is less than that group's estimated availability in the relevant geographic area and labor force." *Id.* at 2.

**ANSWER:** Minnesota admits that the referenced version of the DHS Policy contains the language quoted in Paragraph 52 and denies the remaining allegations.

53.    Minnesota has expressed that its affirmative action plans, including the DHS Policy, are required by Minn. Stat. §§ 43A.19 and 43A.191, and their implementing rules, and that these plans are prospective and analysis-driven, and designed to remedy manifest underutilization of qualified protected group members identified in specific job classifications.

**ANSWER:** Minnesota admits that its affirmative-action plans are required by Minn. Stat. §§ 43A.19 and 43A.191 and implementing rules, and that Minnesota has described its plans as prospective and analysis-driven. Minnesota denies that the DHS Policy is required by Minn. Stat. §§ 43A.19, 43A.191, or their implementing rules. Minnesota denies the remaining allegations in Paragraph 53.

54.    Yet Minnesota identifies no prior or present discrimination to justify its race- and sex-conscious employment policies (such as the DHS Policy). Instead, it has adopted

18

a universal regime for all agencies premised on a lack of numerical congruence between demographic data in a given agency work force and the relevant civilian labor market.

**ANSWER:** Paragraph 54 states legal conclusions and characterizations requiring no response. To the extent that a response is required, Minnesota denies the allegations in Paragraph 54.

55.    Minnesota's affirmative action regime therefore violates Title VII even under the permissive *Weber/Johnson* framework. *See Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 695 (8th Cir. 2009) ("An affirmative action policy is valid [under Title VII] if the policy is remedial and narrowly tailored to meet the goal of remedying the effects of past discrimination.").

**ANSWER:** Paragraph 55 contains legal conclusions and arguments of counsel to which no response is required. To the extent that a response is required, Minnesota denies the allegations in Paragraph 55.

## CAUSES OF ACTION
### Count 1:
### Pattern or Practice in Violation of Section 703(a)(1) of Title VII

56.    The United States realleges and incorporates by reference paragraphs 1-55 of the Complaint as if fully stated herein.

**ANSWER:** Minnesota realleges and incorporates by reference its responses to the allegations in all the above paragraphs numbered 1–55.

57.    Because staffing is a zero-sum game, when Minnesota gives preferences to employees or prospective employees because of their race, color, national origin, and sex, it inevitably and necessarily discriminates against other employees or prospective employees because of their race, color, national origin, and sex.

**ANSWER:** Denied.

58.    Minnesota engages in a pattern and practice of discrimination against state employees and prospective employees, in violation of Section 703(a)(1) of Title VII, as amended, 42 U.S.C. § 2000e-2(a)(1), by making staffing and personnel decisions,

19

including hiring, promotions, transfers, and layoffs, based on individuals' race, color, national origin, and sex.

**ANSWER:** Denied.

59. Minnesota engages in a pattern and practice of discrimination against state employees and prospective employees on the basis of race, color, national origin, and sex in violation of Section 703(a)(1) of Title VII, as amended, 42 U.S.C. § 2000e-2(a)(1), by employing race- and sex-based employment goals.

**ANSWER:** Denied.

60. Minnesota engages in a pattern and practice of discrimination against state employees and prospective employees on the basis of race, color, national origin, and sex in violation of Section 703(a)(1) of Title VII, as amended, 42 U.S.C. § 2000e-2(a)(1), by requiring state agencies to "justify" and receive approval before hiring employees who are not female, black, Hispanic, Asian, Pacific Islander, American Indian, or Alaskan native.

**ANSWER:** Denied.

61. The Attorney General has reasonable cause to believe that Minnesota regularly and purposefully treats certain employees and prospective employees less favorably because of their race, color, national origin, and sex, and that this unlawful discrimination, that is mandated by Minnesota statutes and implementing rules, is Minnesota's regular procedure or policy.

**ANSWER:** Minnesota lacks knowledge or information sufficient to form a belief about the Attorney General's stated beliefs and on that basis denies them, and denies the remaining allegations of Paragraph 61, including that any reasonable cause exists or that Minnesota has engaged in any pattern or practice of discrimination.

62. The Attorney General has reasonable cause to believe that Minnesota's race and sex-conscious staffing and personnel practices violate Section 703(a)(1) and are "a pattern or practice of resistance to the full enjoyment of" the rights of state employees and prospective employees to equal employment opportunities without discrimination because of race, color, national origin, or sex. *See* Section 707(a) of Title VII, as amended, 42 U.S.C. § 2000e-6(a).

**ANSWER:**  Minnesota lacks knowledge or information sufficient to form a belief about the Attorney General's stated beliefs and on that basis denies them, and denies the remaining allegations of Paragraph 62, including that any reasonable cause exists or that Minnesota has engaged in any pattern or practice of discrimination.

63.    The United States, through the United States Department of Justice, has notified Minnesota of the United States' determination that Minnesota's pattern or practice of discrimination described herein is unlawful.

**ANSWER:**  Admitted in part and denied in part. Minnesota admits that on January 8, 2026, the United States, through the Department of Justice, notified Minnesota of the Department's conclusions and of its authorization of this lawsuit. *See* Letter from Harmeet K. Dhillon to Keith Ellison, dated January 8, 2026 (Dkt. 20-4). Minnesota denies that the notice identified "reasonable cause" or reflects a reasonable-cause determination by the Attorney General under 42 U.S.C. § 2000e-6(a), denies that the notice addressed all of the policies, practices, and protected characteristics on which the Complaint now seeks relief, denies that any pattern or practice of discrimination exists, and denies the remaining allegations in Paragraph 63.

**Count 2:**
**Pattern or Practice in Violation of Section 703(a)(2) of Title VII**

64.    The United States realleges and incorporates by reference paragraphs 1-63 of the Complaint as if fully stated herein.

**ANSWER:**  Minnesota realleges and incorporates by reference its responses to the allegations in all the above paragraphs numbered 1–63.

65.    Minnesota Statute § 43A.02, subd. 33, defines "protected groups" by race, color, national origin, sex, and disability. This definition is not merely descriptive; it is incorporated directly into Minnesota's affirmative action mandate in Chapter 43A,

21

including the numerical-goal, underutilization, and pre-hire-justification requirements. As a result, Minnesota classifies employees and prospective employees into discrete racial and sex-based groups for the purpose of affecting employment statuses and decisions.

**ANSWER:** Admitted in part and denied in part. Minnesota admits that Minn. Stat. § 43A.02, subd. 33 defines "protected groups" and that the definition applies within Chapter 43A. Minnesota states that any identification or aggregation of protected-class characteristics for workforce analysis or reporting is conducted consistent with federal recordkeeping and reporting requirements. Minnesota denies that it classifies employees or prospective employees for the purpose of affecting, or as a basis for, any employment opportunity or decision, denies that any such classification deprives or tends to deprive any individual of employment opportunities or adversely affects any individual's employment status under Section 703(a)(2), and denies the remaining allegations in Paragraph 65.

66.    Through these statutory and regulatory provisions, Minnesota uses race, color, national origin, and sex as operative decision-making criteria in staffing and personnel actions.

**ANSWER:** Denied.

67.    Minnesota law requires agencies to track "underutilization" of the defined protected groups and take affirmative steps to eliminate such underutilization. Supervisors must identify the race and sex composition of the candidate pool and determine whether a protected group is underutilized in the relevant category. When underutilization exists, agencies impose additional procedural burdens on candidates who are not members of the designated protected groups.

**ANSWER:** Admitted in part and denied in part. Minnesota admits that it conducts underutilization analysis based on workforce and availability data to identify barriers to equal employment opportunities. Minnesota denies that supervisors must identify the race or sex composition of candidate pools, denies that agencies impose burdens on any

22

candidate because of race, color, national origin, or sex, and denies the remaining allegations in Paragraph 67.

68.    These classifications deprive those who are not in Minnesota's chosen protected groups of employment opportunities, and adversely affect their employment statuses, in violation of Section 703(a)(2) of Title VII, as amended, 42 U.S.C. § 2000e-2(a)(2).

**ANSWER:**  Denied.

69.    Minnesota limits, segregates, and classifies its employees and prospective employees based on race, color, national origin, and sex to effectuate its unlawful race- and sex-preference policies, because only through such limiting, segregating, and classifying can Minnesota accomplish its race- and sex-balancing goals.

**ANSWER:**  Denied.

70.    The Attorney General has reasonable cause to believe that Minnesota regularly and purposefully limits, segregates, and classifies employees and prospective employees because of their race, color, national origin, and sex, and that this limitation, segregation, and classification, that is mandated by Minnesota statutes and implementing rules, is Minnesota's regular procedure or policy.

**ANSWER:**  Minnesota lacks knowledge or information sufficient to form a belief about the Attorney General's stated beliefs and on that basis denies them, and denies the remaining allegations of Paragraph 70, including that any reasonable cause exists or that Minnesota has engaged in any pattern or practice of discrimination.

71.    The Attorney General has reasonable cause to believe that Minnesota's limitation, segregation, and classification of its employees and prospective employees violates Section 703(a)(2) and is "a pattern or practice of resistance to the full enjoyment of" the rights of state employees and prospective employees to equal employment opportunities without discrimination because of race, color, national origin, or sex. *See* Section 707(a) of Title VII, as amended, 42 U.S.C. § 2000e-6(a).

**ANSWER:**  Minnesota lacks knowledge or information sufficient to form a belief about the Attorney General's stated beliefs and on that basis denies them, and denies the

23

remaining allegations of Paragraph 71, including that any reasonable cause exists or that Minnesota has engaged in any pattern or practice of discrimination.

72. The United States, through the United States Department of Justice, has notified Minnesota of the United States' determination that Minnesota's pattern or practice of limiting, segregating, and classifying employees and prospective employees described herein is unlawful.

**ANSWER:** Admitted in part and denied in part. Minnesota admits that on January 8, 2026 the United States, through the Department of Justice, notified Minnesota of the Department's conclusions and of its authorization of this lawsuit. *See* Letter from Harmeet K. Dhillon to Keith Ellison, dated January 8, 2026 (Dkt. 20-4). Minnesota denies that the notice identified "reasonable cause" or reflects a reasonable-cause determination by the Attorney General under 42 U.S.C. § 2000e-6(a), denies that the notice addressed all of the policies, practices, and protected characteristics on which the Complaint seeks relief, denies that any pattern or practice of limiting, segregating, or classifying employees or prospective employees exists, and denies the remaining allegations in Paragraph 72.

## PRAYER FOR RELIEF

Minnesota denies that the United States is entitled to any of the relief sought in paragraphs (a) through (e) of the Complaint's Prayer for Relief.

## AFFIRMATIVE DEFENSES

1. The Complaint fails to state a claim upon which relief can be granted.

2. The United States' claims are barred, in whole or in part, because the United States failed to satisfy the conditions precedent to suit under Section 707, 42 U.S.C. § 2000e-6(a), including the requirement of a reasonable-cause determination addressing the

24

statutes, rules, policies, and alleged patterns or practices on which the Complaint seeks relief.

3.      The United States' claims and any relief are limited to the facial challenge to Minnesota's statutory framework and rules that the United States pleaded and represented to the Court. The United States may not recast this action as an as-applied challenge to agency-specific hiring decisions, individual employment actions, superseded or non-operative policies, or unpleaded practices.

4.      The United States' claims are barred, in whole or in part, for lack of a justiciable case or controversy, including mootness, to the extent that they seek relief based on superseded, rescinded, or otherwise non-operative laws, rules, or policies.

5.      The United States' claims are barred, in whole or in part, because Minnesota's collection, maintenance, analysis, and reporting of aggregate workforce demographic data, provided by its applicants and employees through voluntary self-identification, are required or authorized by federal law, including but not limited to Section 709(c) of Title VII, 42 U.S.C. § 2000e-8(c), and 29 C.F.R. part 1602, and Minnesota relied in good faith on the Equal Employment Opportunity Commission's written recordkeeping and reporting instructions, including but not limited to the EEO-4 requirements, under Section 713(b), 42 U.S.C. § 2000e-12(b). Such federally required or authorized data practices do not violate Title VII.

6.      In the alternative, the United States' claims for liability and relief based on past conduct are barred, in whole or in part, by Section 713(b) of Title VII, 42 U.S.C. § 2000e-12(b), to the extent that Minnesota acted in good faith, in conformity with, and in

reliance on written regulations, interpretations, and opinions of the Equal Employment Opportunity Commission, including 29 C.F.R. part 1608.

7. Any claim for declaratory, injunctive, or other equitable relief must be limited to a proven Title VII violation as to a specific practice. The United States is not entitled to victim-specific relief absent proof of individual injury caused by a proven violation, particularly where the United States has represented that it need not identify, and has not identified, any specific instance of discrimination. Any such victim-specific relief is further subject to applicable mitigation principles.

8. The United States is not entitled to attorney's fees because 42 U.S.C. § 2000e-5(k) authorizes a fee award only to a prevailing party "other than the Commission or the United States."

9. The United States' claims are barred because the United States is selectively enforcing Title VII against Minnesota, while declining to pursue similarly situated state government employers, for reasons unrelated to the merits.

10. The United States' claims are barred in whole or in part by equitable doctrines including, without limitation, laches, unclean hands, estoppel, acquiescence, ratification, and waiver.

11. Minnesota reserves the right to assert additional affirmative or other defenses that may become known through discovery or further investigation and expressly does not waive any such defenses by their omission from this pleading.

## DEFENDANT'S PRAYER FOR RELIEF

Minnesota respectfully requests that this Court:

(a) dismiss the United States' Complaint with prejudice and on the merits;

(b) enter judgment in Minnesota's favor with respect to all of the claims and causes of action in the Complaint;

(c) award Minnesota its costs and, to the extent authorized by law, including 28 U.S.C. § 2412 and 42 U.S.C. § 2000e-5(k), its reasonable attorney fees and disbursements; and

(d) enter an order providing Minnesota any other relief that the Court deems just and proper under these circumstances.


Dated:  June 16, 2026                    KEITH ELLISON
                                         Attorney General
                                         State of Minnesota


                                         s/ **Nick Pladson**
                                         _____
                                         NICK PLADSON
                                         Assistant Attorney General
                                         Atty. Reg. No. 0388148

                                         PETER J. FARRELL
                                         Deputy Solicitor General
                                         Atty. Reg. No. 0393071

                                         445 Minnesota Street, Suite 600
                                         St. Paul, Minnesota 55101-2125
                                         (651) 300-7083 (Voice)
                                         (651) 296-7438 (Fax)
                                         Nick.Pladson@ag.state.mn.us

                                         *ATTORNEYS FOR STATE OF MINNESOTA*

|#6283446-v1