IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Formatted: Different first page header

Formatted Table

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>STATE OF MINNESOTA,<br><br>*Defendant*. | Civil No.<br><br>**PROPOSED AMENDED COMPLAINT**<br><br>No. 26-cv-00273-PJS-RWG-DPM-SGE<br><br>THREE-JUDGE DISTRICT COURT REQUESTED |

Formatted: Centered

**COMPLAINT**

"The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007). This logic extends to invidious discrimination on the basis of sex. Yet in the name of stopping race and sex discrimination, Minnesota law requires the state to discriminate against its current and prospective employees on the basis of race and sex. But this is not just an ineffective plan to stop discrimination. It is an unlawful plan. To break this discrimination chain once and for all, the United States of America brings this action against the State of Minnesota under Title VII of the Civil Rights Act of 1964 and alleges:

**INTRODUCTION**

Formatted: Font: Not Bold

Formatted: Space Before: 12 pt

1. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 208 (2023) (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)). Federal civil rights laws, including Title VII of the Civil Rights Act of 1964, reflect this truth.

Minnesota law requires executive branch agencies to set numerical goals for the race and sex composition of the state workforce and imposes onerous reporting requirements, audits, and sanctions to ensure compliance. If an agency has not met its quotas for Minnesota's favored races (black, Hispanic, Asian, Pacific Islander, American Indian, and Alaskan native) or sex (female), the agency must jump through hoops to "justify" hiring an employee who belongs to a disfavored demographic.

This affirmative action policy—which is codified in Minnesota statutes and rules—on its face establishes a pattern and practice of resistance to the full enjoyment of rights secured by Title VII of the Civil Rights Act of 1964, as amended. In striving to hire, promote, and maintain a target number of black, Hispanic, Asian, Pacific Islander, American Indian, Alaskan native, and female employees (including through the hiring justification requirement), Minnesota puts a thumb on the scale to favor certain individuals simply because of their race or sex. This policy requires the classification of current and prospective State employees based on their race and sex, limits their employment opportunities because of those classifications, and mandates discrimination against current and prospective State employees (who are not members of Minnesota's favored races or sex) because of their immutable characteristics.

Minnesota's affirmative action policy relegates current and prospective State employees to an unequal playing field determined by their race or sex. For those whose race or sex Minnesota disfavors, this unequal playing field is a discriminatory barrier to employment opportunities. Because this policy violates Title VII, the United States of America brings this action against Minnesota for declaratory and injunctive relief and alleges the following:

2.1. Under Title VII, of the Civil Rights Act of 1964, as amended, (Title VII) it is unlawful for employers to discriminate against, or limit, segregate, or classify in any way that would adversely affectdeprive, or tend to deprive, the employment opportunities of, current or prospective employees because of their race, color, religion, sex, or national origin.[1] 42 U.S.C. § 2000e-2(a)(1)-(2).

3. Yet in 1979, the United States Supreme Court "introduce[d] into Title VII a tolerance for the very evil that the law was intended to eradicate," *United Steelworkers of Am. v. Weber*, 443 U.S. 193, 254-55 (1979) (Rehnquist, J., dissenting), and held that Title VII authorizes private employers to adopt "affirmative action plans designed to eliminate conspicuous racial imbalance in traditionally segregated job categories," *id.* at 209.

4. Because Title VII's text does not support such an exception to its prohibition of racial discrimination in employment, the Court resorted to Title VII's "spirit" to justify its holding.Minnesota's race- *Id.* at 201 (quoting *Holy Trinity Church v. United States*, 143 U.S. 457, 459 (1892)).

[1] References herein to "race" encompass race, color, and national origin.

Formatted: Font: Times New Roman, 13 pt

5. Eight years later, the Court extended *Weber* to public employers and sex-based affirmative action policy, codified at Minn. Stat. . *Johnson v.* §§ 43A.01, 43A.09, 43A.14, 43A.19, 43A.191 and Minn. R. 3905.0100 *et seq*. (Policy).*Transp. Agency, Santa Clara Cnty.*, 480 U.S. 616, 639-42 (1987).

6. With that, the Court "complete[d] the process of converting [Title VII] from a guarantee that race or sex will *not* be the basis for employment determinations, to a guarantee that it often *will*." *Id.* at 658 (Scalia, J., dissenting).

Formatted: Font: Not Italic

7. Diverging from *Weber* and *Johnson*, the Supreme Court has since directed, when interpreting Title VII, that "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. *Only the written word is the law*, and all persons are entitled to its benefit." *Bostock v. Clayton County*, 590 U.S. 644, 653 (2020) (emphasis added).

8. "Title VII's 'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656. Under that test, "[s]o long as the plaintiff's sex [or race, color, religion, or national origin] was one but-for cause of [the challenged employment decision], that is enough to trigger the law." *See id.*

9. "Employers may not 'fail or refuse to hire or . . . discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's'" race, color, religion, sex, or national origin. *See id.* at 658 (quoting 42 U.S.C. § 2000e-2(a)(1)) (emphasis omitted). And it does not matter if factors other than race, color, religion, sex, or national origin contributed to the employer's decision. *See id.* at 659.

10. "[P]ut differently, if changing the employee's [race, color, religion, sex, or national origin] would have yielded a different choice by the employer a statutory violation has occurred." *See id.* at 659-60.

11. Minnesota laws, enacted around the time that *Weber/Johnson* greenlighted race and sex discrimination under Title VII, demonstrate the consequences of these precedents.

12.2. To "eliminate the effects of past and present discrimination, intended or unintended, on the basis of protected group status" in state civil service, Minnesota law requires the adoption of "a statewide affirmative action program," Minn. Stat. §- 43A.19, subd. 1(a), and the "consideration of affirmative action goals on all staffing and personnel decisions," Minn. R. 3905.0100.

13.3. By following this statutory and regulatory affirmative action mandate,The Policy establishes that Minnesota, as an employer, is engaged in a pattern or practice of resistance to the full enjoyment of rights secured by Title VII, including the rights under Section 703(a) to be free from employment-related classification, limitation, and discrimination because of race and sex, and that pattern or practice is intended to deny current and prospective and existing stateState employees the full exercise of Title VII rights. *See* 42 U.S.C. §§§ 2000e-2(a)(1)-(2), 2000e-6(a).

**JURISDICTION AND VENUE**

14.4. This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. (Title VII). *See also* Exec. Order No. 12068, 43 Fed. Reg. 28971

(June 30, 1978) ("Providing for Transfer to the Attorney General of Certain Functions Under Section 707 of Title VII of the Civil Rights Act of 1964, as Amended").

~~15.~~5. This Court has jurisdiction ~~of~~over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 2000e-6.

~~16.~~6. Venue for this action is proper in the United States District Court for the District of Minnesota, pursuant to 28 U.S.C. § 1391(b).

7. ~~Because this case is of general public importance, as certified by~~Following an investigation, the Attorney General of the United States (Attorney General) concluded that there is "reasonable cause to believe" that Minnesota "is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by" Title VII and that this "pattern or practice is . . . intended to deny the full exercise of the rights" of current and prospective State employees, including the rights under Section 703(a) to be free from employment-related classification, limitation, and discrimination because of race and sex. *See* 42 U.S.C. §§ 2000e-2(a)(1)-(2), 2000e-6(a).

8. This suit therefore is properly before this Court and ripe for adjudication because, unlike the Equal Employment Opportunity Commission (EEOC), the Attorney General need not satisfy Section 706's statutory pre-suit requirements. *See, e.g.*, *United States v. Rhode Island Dep't of Corr.*, 81 F. Supp. 3d 182, 187-88 (D.R.I. 2015); *United States v. New Jersey*, 473 F. Supp. 1199, 1203-05 (D.N.J. 1979); *Lanning v. Se. Pa. Transp.* ~~, *see* Ex. A,~~*Auth.*, 176 F.R.D. 132, 140 (E.D. Pa. 1997).

~~17.~~9. The Attorney General has certified this case as one of general public importance, and Plaintiff United States of America ~~respectfully invokes~~has invoked its

right under 42 U.S.C. §- 2000e-6(b) to expedited proceedings before a three-judge district court. *See* Dkt. 3.

**PARTIES**

18.10. Plaintiff United States of America (United States) brings this action under Section 707 of Title VII, as amended, 42 U.S.C. § 2000e-6.

19.11. Defendant State of Minnesota (Minnesota or State) is a "person," as defined by 42 U.S.C. § 2000e(a), and an "employer," as defined by 42 U.S.C. § 2000e(b).

**FACTS**

Formatted: Keep with next, Keep lines together

**Minnesota's Statutory and Regulatory Affirmative Action RegimePolicy**

20.12. For the stated purposes of "assur[ing] that positions in the executive branch of the civil service are equally accessible to all qualified persons, and . . . eliminat[ing] the effects of past and present discrimination," Minnesota law mandates a statewide affirmative action program for state civil service, Minn. Stat. § 43A.19, subd. 1(a), and requires "consideration of affirmative action goals on *all* staffing and personnel decisions," Minn. R. 3905.0100 (emphasis added).

13. Minnesota requires "[a]ll appointments to the classified service [to] be based upon merit and ability to perform the duties of the position and the needs of the employing agency, *including the need to achieve and maintain a representative work force*[.]" Minn. Stat. § 43A.14 (emphasis added).

14. "Special emphasis shall be given to recruitment of . . . protected group members . . . to assist state agencies in meeting affirmative action goals to achieve a balanced work force." Minn. Stat. § 43A.09.

15. "Protected groups" means "females, persons with disabilities, and members of the following minorities: Black, Hispanic, Asian or Pacific Islander, and American Indian or Alaskan native." Minn. Stat. § 43A.02, subd. 33.[2]

16. Given this definition of who is "protected," Minnesota law expressly requires the classification of current and prospective State employees by race and sex. Absent such classification, Minnesota could not comply with the statutorily mandated affirmative action Policy.

17. The Policy requires such classification not for statistical analysis, nor to comply with any purported federal requirements, but rather to permit Minnesota to meet its goal of "achiev[ing] and maintain[ing] a representative work force," Minn. Stat. § 43A.14, ostensibly to "eliminate the effects of past and present discrimination, intended or unintended, on the basis of protected group status" in state civil service, Minn. Stat. § 43A.19, subd. 1(a).

~~21.~~ The Policy charges the commissioner of Minnesota Management and Budget (MMB) ~~is the state agency charged with overseeing the~~ to "adopt and periodically revise . . . a statewide affirmative action program~~. *Affirmative Action*, Minnesota Management & Budget, https://perma.cc/YT7M-S9YR.~~

Formatted: Ligatures: None

~~22. MMB describes "Affirmative Action" as "[p]ositive steps to get qualified individuals who were historically discriminated in employment"; quantitative and reactive;~~

[2] This action concerns only Minnesota's race- and sex-based affirmative action Policy. The United States does not challenge the components of the statutes and rules that concern persons with disabilities or veterans.

and focused, *inter alia*, on race and sex. *2022-2024 Affirmative Action Data Analysis Training*, Minnesota Management & Budget, 7, https://perma.cc/BN5W-VKCH.

23.18. The Commissioner of MMB must "adopt and periodically revise . . . a statewide affirmative action program."." Minn. Stat. § 43A.19, subd. 1(a); *see*). *See also id.* § 43A.02, subd. 13.

24.19. The statewide affirmative action program must include, *inter alia*, "objectives, goals, and policies";," "procedures, standards, and assumptions to be used by agencies in the preparation of agency affirmative action plans, including methods by which goals and timetables are established"; and "requirements for annual objectives and submission of affirmative action progress reports from heads of agencies." Minn. Stat. § 43A.19, subd. 1(a).

25.20. The CommissionerMMB commissioner must "establish statewide affirmative action goals" based on (1) "the percentage of members of each protected class in the recruiting area population who have the necessary skills";" and (2) "the availability for promotion or transfer of current employees who are members of protected classes." Minn. Stat. § 43A.19, subd. 1(b)(1)-(2).

21. Each agency must also "prepare and implement an agency affirmative action plan" in accordance with Minnesota's statutory requirements and rules promulgated thereunder. Minn. Stat. § 43A.191, subd. 2(a).

26.22. "Agency heads" likewise shall establish numerical affirmative action goals byfor each protected group. Minn. R. 3905.0600, subp. 4-5. Goals are determined by Agency heads shall set these goals by comparing the protected-group composition of the

agency unit ~~work force~~workforce to the composition of the relevant civilian labor market. *Id.* at subp. 5.

~~27.~~23. If the comparison shows that a unit underutilizes a protected group, the agency head shall establish a goal for that protected group in that unit, ~~*id.*,~~Minn. R. 3905.0600, subp. 5, and a timetable for meeting that goal, *id.* at subp. 6.

~~28. All Minnesota executive agencies are statutorily required to classify employees and applicants as either members or non-members of a protected class or group. *See Monitoring the Hiring Process*, Minnesota Management & Budget, https://perma.cc/XE5U-YNKH (requiring tracking of "underutilization of a protected group in a job category").~~

~~29. The protected groups or classes under Minnesota law are "females, persons with disabilities, and members of the following minorities: Black, Hispanic, Asian or Pacific Islander, and American Indian or Alaskan native." Minn. Stat. § 43A.02, subd. 33.~~

~~30. Given this definition of who is "protected," Minnesota law necessarily requires classification of employees and potential employees by race and sex. Absent such classification, Minnesota could not develop and implement its statutorily mandated affirmative action policies.~~

~~31. MMB also instructs agencies to calculate "Final Availability," also known as, "What We Should Look Like." This is "[a]n estimate percentage of qualified females, racial/ethnic minorities, or individuals with disabilities available for employment in the relevant labor market who are available . . . in a given job category." It is "used to identify~~

what the qualified workforce in the job category [is] supposed to look like." *2022-2024 Affirmative Action Data Analysis Training*, *supra* ¶ 22, at 15.

32. Final availability is "compared to the job category headcounts to determine the existence of underutilization." *Id.*

33. If an agency does not meet its affirmative action hiring goals—meaning "there is an underutilization of a protected group in a job category"—the hiring manager must "justify its nonaffirmative action hires" by submitting a Pre-Hire Justification Form (PHJ) that "explain[s] the reason for hiring a non-affirmative candidate." Minn. Stat. § 43A.191, subd. 3(c); *Monitoring the Hiring Process*, *supra* ¶ 28.

34. Put otherwise, Minnesota requires its hiring managers to jump through additional hoops to hire employees with disfavored skin colors or sex chromosomes.

35. State agencies analyze PHJ forms and "may determine [that] the minimum qualifications need to change or [that] the agency needs to recruit differently for this position." *Monitoring the Hiring Process*, *supra* ¶ 28.

36.1. Minnesota's statutes, rules, and policies therefore are intended to require, and do require, agencies to balance the race and sex of their work forces with the relevant civilian labor markets. Minn. R. 3905.0600, subp. 5 ("The [numerical employment] goals must be based on a comparison of the composition of the agency or agency subdivision work force with the composition of the relevant civilian labor force in an identified labor market area.").

Formatted: Font: Italic

37.1. Each agency must also "prepare and implement an agency affirmative action plan" in accordance with statutory requirements and rules promulgated thereunder. Minn. Stat. § 43A.191, subd. 2(a).

38. MMB supplies agencies with templates and other resources to prepare and implement these plans. *See Affirmative Action Resources*, Minnesota Management & Budget, https://perma.cc/2NT4-G9LZ.

39.24. For agencies with 25 or more employees, the plan must "identify and describe methods for developing programs and program objectives designed to meet affirmative action goals" and "describe methods of auditing, evaluating, and reporting program success, including a procedure that requires a preemployment review of all hiring decisions for goal units with unmet affirmative action goals and prereview of all layoff decisions to determine their effect on agencies' affirmative action goals and timetables." Minn. R. 3905.0400, subp. 1(H)-(I).

40.25. For agencies with lessfewer than 25 employees, the plan must "state the agency head's objective to hire members of protected groups when vacancies occur if an apparent underutilization of protected group members exists in the agency work force." Minn. R. 3905.0400, subp. 2(B).

26. If an agency does not meet its affirmative action hiring goals—meaning there is an underutilization of a protected group in a job category—the hiring manager must "justify its nonaffirmative action hires." Minn. Stat. § 43A.191, subd. 3(c).

27. In other words, the Policy explicitly requires hiring managers to jump through additional hoops to hire employees of a disfavored race or sex. Minnesota has even confirmed this plain-reading interpretation of the statutory justification requirement:

> Minnesota Management & Budget (MMB) is required under Minnesota Statutes 2023, section 43A.191, subdivision 3, C to report to the Legislature agency appointments where there is an underutilization of a protected group in a job category. If there is an underutilization, the Monitoring the Hiring Process (MHP) Form tracks all affirmative and non-affirmative hires. *If the hire was non-affirmative, the hire must be justified. To justify the hire, the hiring manager will submit a Pre-Hire Justification (PHJ) Form explaining the reason for hiring a non-affirmative candidate.*

*See Monitoring the Hiring Process*, Minnesota Management & Budget, https://perma.cc/XE5U-YNKH (emphasis added).

41.28. The CommissionerMMB commissioner must audit each agency annually "to determine the rate of compliance with affirmative action requirements," and if an agency "fails to meet any of its affirmative action requirements for two consecutive years," the Commissionercommissioner must report the findings to the governor. Minn. Stat. § 43A.191, subd. 3(a).

42.29. An agency not in compliance with affirmative action requirements must "identify methods and programs to improve performance, to reallocate resources internally in order to increase support for affirmative action programs, and to submit resource reallocation proposals to the commissioner for approval." Minn. Stat. § 43A.191, subd. 3(f).

43.30. Minnesota lawThe Policy also contemplates incentivesmandates recognition for meetingagencies that meet affirmative action goals and requirements: "The

commissioner shall establish a program to recognize an agency that has made significant and measurable progress in implementing an affirmative action plan." Minn. Stat. § 43A.191, subd. 3(g).

~~44.~~31. Agencies are "encouraged to develop other innovative ways to promote awareness, acceptance, and appreciation for diversity and affirmative action. These innovations will be considered when evaluating an agency's compliance" with affirmative action requirements. Minn. Stat. § 43A.191, subd. 3(e).

32. The Policy is intended to require, and does require, agencies to set quotas to balance the race and sex composition of their work forces to match the race and sex composition of the relevant civilian labor markets. *See* Minn. R. 3905.0600, subp. 5 ("The [numerical employment] goals must be based on a comparison of the composition of the agency or agency subdivision work force with the composition of the relevant civilian labor force in an identified labor market area.").

Formatted: Font: Italic

## LEGAL & PROCEDURAL BACKGROUND

Title VII makes clear that employers who have express discriminatory policies are subject to liability, regardless of whether there are identifiable victims of such policies. For instance, Section 707 authorizes the Attorney General to institute a civil action whenever he "has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice *of resistance to the full enjoyment of any of the rights* secured by" Title VII, including the rights under Section 703(a) to be free from employment-related classification, limitation, and discrimination because of race and sex. *Id.* § 2000e-6(a) (emphasis added). *See also id.* § 2000e-2(a)(1)-(2). Title VII also makes it unlawful for

an employer "to limit, segregate, or classify his employees or applicants for employment in any way which *would deprive or tend to deprive* any individual of employment opportunities." *Id.*, Minnesota Department of Human Services

Formatted: Font: Not Italic

33. The § 2000e-2(a)(2) (emphasis added).

34. If a "discriminatory policy is openly declared," then such a pattern or practice exists, and "proof that the policy was actually being followed consistently is not necessary in order to obtain an injunction against subsequent implementation" under Section 707. *United States v. Bd. of Educ. for Sch. Dist. of Phila.*, 911 F.2d 882, 892 (3d Cir. 1990). *See also Sperling v. Hoffmann-La Roche, Inc.*, 924 F. Supp. 1346, 1358 (D.N.J. 1996) ("[S]uch a policy of discrimination may be demonstrated by showing either a consistent history of discriminatory decisionmaking in an employer's employment practices *or by showing that the employer has an openly declared discriminatory policy*." (emphasis added)); *EEOC v. Catholic Healthcare W.*, 530 F. Supp. 2d 1096, 1101-04 (C.D. Cal. 2008) (finding a pattern or practice of discrimination, as a matter of law, where the defendant's official policy was facially discriminatory).

35. Following the Supreme Court's decisions in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) and *Ames v. Ohio Department of Youth Services*, 605 U.S. 303 (2025), the United States has prioritized enforcing Title VII's mandate against race- and sex-based employment preferences by state and local government employers. To that end, the Department of Justice has publicly opened investigations into, *inter alia*, the State of Rhode Island; the Rhode Island Department of Education and the Providence Public School District; George Mason

University; the California Environmental Protection Agency; the University of California; the Des Moines Public Schools; the Minneapolis Public Schools; the State of Minnesota; the City of Baltimore, Maryland; and the City of Austin, Texas. Other investigations, which are not yet public, are also ongoing.

36. On July 10, 2025, the United States notified Minnesota Department of Human Services' (DHS) Hiring Justification Policy, No. 4100.250 (DHS Policy) provides an example of howAttorney General Keith Ellison that it was opening an investigation to determine whether Minnesota discriminates against its employees,is engaged in a pattern or practice of discrimination based on race and sex in violation of Title VII, under its .

37. This notice letter informed Minnesota that the United States had reason to believe that Minnesota was engaged in unlawful action through, *inter alia*, a hiring justification policy that seemingly required hiring supervisors to provide a justification when hiring a non-underrepresented candidate for a vacancy in a job category with underrepresentation.

38. The letter also noted that the hiring justification policy "appear[ed] to be just one component of a broader effort by Minnesota to engage in race- and sex-based employment practices pursuant to 'affirmative action' objectives" and that the Assistant Attorney General of the Civil Rights Division had "authorized a full investigation to determine whether Minnesota is engaged in a pattern or practice of discrimination."

39. In response to the United States' request for information, Minnesota confirmed that (1) "situated within Minnesota's affirmative action (AA) framework, a 'hiring justification' or preemployment review procedure is required for certain positions";

(2) "each agency implements affirmative action plans under state law"; and (3) "affirmative action plans identify affirmative action goals and whether the prior goals have been met."

45.40. Having verified and reviewed Minnesota's statutory and regulatory affirmative action Policy, statements and document productions from Minnesota, and various Minnesota agencies' publicly available affirmative action plans, the Attorney General confirmed that the Policy is operative and Minnesota's standard operating procedure and concluded that there is "reasonable cause to believe" that Minnesota "is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by" Title VII and that this "pattern or practice is . . . intended to deny the full exercise of the rights" of current and prospective State employees of the State of Minnesota, including the rights under Section 703(a) to be free from employment-related classification, limitation, and discrimination because of race and sex. 42 U.S.C. regime. *See* Ex. B.§§ 2000e-2(a)(1)-(2), 2000e-6(a).

46. The DHS Policy lists Minnesota Statutes, Chapter 43A; and Minnesota Rules, Chapter 3905, as its express authority. *Id.* at 1.

47. The DHS Policy's stated purpose is "to ensure DHS meets affirmative action responsibilities to comply with state statutes and [to] increase the diversity of its workforce to reflect and effectively serve its client base." *Id.*

48.41. The DHS Policy is consistent withSpecifically, the Attorney General concluded that Minnesota's statutory and regulatory affirmative action regime, detailed in paragraphs 20-44, *supra*. Policy is an express discriminatory policy that, on its face, violates Title VII by requiring State agencies to discriminate against, classify, and limit

current and prospective State employees because of their race and sex.

49. UnderOn January 8, 2026, the DHS Policy, "[h]iring supervisors must provide a hiring justification when seeking to hire a non-underrepresented candidate when hiring for a vacancy in a job category with underrepresentation." Ex. B at 1.

50. The DHS Policy prohibits hiring supervisors from "mak[ing] an offer of employment to a non-underrepresented candidate for vacancies in job categories with underrepresentation, before a hiring justification is approved by DHS Equal Opportunity and Access Division[.]" *Id.* at 3.

51. A hiring supervisor must offer interviews to at least three underrepresented candidates if the interview pool contains three or more underrepresented candidates. *Id.*

52. "Underrepresented" means that the full-time equivalent "representation of one or more protected groups is less than that group's estimated availability in the relevant geographic area and labor force." *Id.* at 2.

53. United States notified Minnesota has expressed that of its affirmative action plans, including the DHS Policy, are required by Minn.conclusion that Stat. §§ 43A.19 and 43A.191, and their implementing rules, and that these plans are prospective and analysis-driven, and designed to remedy manifest underutilization of qualified protected group members identified in specific job classifications.

54. Yet Minnesota identifies no prior or present discrimination to justify its race- and sex-conscious employment policies (such as the DHS Policy). Instead, it has adopted a universal regime for all agencies premised on a lack of numerical congruence between demographic data in a given agency work force and the relevant civilian labor market.

55.42. Minnesota's affirmative action regime therefore is engaged in a pattern or practice that violates Title VII even under the permissive *Weber/Johnson* framework. *See Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 695 (8th Cir. 2009) ("An affirmative action policy is valid [under and that the Assistant Attorney General of the Civil Rights Division had authorized filing a lawsuit against Minnesota pursuant to Section 707 of Title VII] if the policy is remedial and narrowly tailored to meet the goal of remedying the effects of past discrimination.")..

43. In the January 8, 2026, letter, the United States offered to resolve this matter without litigation by entering a consent decree that would permanently enjoin Minnesota from relying on race, color, national origin, or sex in its employment decisions.

44. On January 13, 2026, counsel for Minnesota advised counsel for the United States that it would not agree to enter a consent decree containing the terms that the United States' January 8 letter proposed. Accordingly, the United States filed its original complaint in this action the following day. *See* Dkt. 1.

45. Even if Minnesota alleges that it enacted the Policy in "good faith" reliance on EEOC's guidelines (Guidelines), EEOC's Guidelines do not provide for a good faith reliance defense to this action. *See* 29 C.F.R. § 1608.10(a) (1979) (describing a defense for respondents to a "charge of discrimination filed with the Commission"); 42 U.S.C. § 2000e-12(b) (providing a defense for unlawful employment practices when the employer relied in good faith on a written interpretation or opinion of the Commission).

46. EEOC's Guidelines contemplated a potential defense only for "charge[s] of discrimination filed with [EEOC]." 29 C.F.R. § 1608.10(a) (1979). This action is a lawsuit

filed by the Department of Justice in federal district court—not an EEOC charge.

47. Further, the EEOC rescinded its Affirmative Action Guidelines, *see* 29 C.F.R. § 1608.10 (2026); 91 Fed. Reg. 40879 (2026), Minnesota's Policy remains in effect, and the United States seeks only forward-looking declaratory and injunctive relief in this action.

48. Therefore, no such "good faith" reliance defense applies.

## CAUSES OF ACTION

**Count 1:**
**Pattern or Practice of Discrimination in Violation of Section 703(a)(1) of Title VII**

~~56.~~49. The United States realleges and incorporates by reference all preceding paragraphs ~~1-55~~ of the Complaint as if fully stated herein.

~~57.~~50. Because staffing is a zero-sum game, ~~when Minnesota gives~~an employment policy that requires preferences ~~to employees or~~for current and prospective employees because of their race, color, national origin, ~~and~~or sex~~, it~~ inevitably and necessarily ~~discriminates~~mandates discrimination against other ~~employees~~current or prospective employees because of their race, color, national origin, and sex.

51. Minnesota Statute § 43A.02, subd. 33, defines "protected groups" by race, color, national origin, and sex. This definition is not merely descriptive; it is incorporated directly into Minnesota's affirmative action Policy in Chapter 43A, including the numerical goals and pre-hire-justification requirements.

52. The text of the affirmative action Policy mandates the use of race, color, national origin, and sex as decision-making criteria in all staffing and personnel decisions.



**Formatted:** Keep with next

**Formatted:** Space After: 13 pt, Keep with next, Keep lines together

**Formatted:** Keep with next, Keep lines together

53. The Policy requires agencies to track "underutilization" of the defined protected groups and to take affirmative steps to eliminate such underutilization. Supervisors must determine the race and sex composition of its workforce and candidate pool and determine whether a protected group is underutilized in the relevant category. When underutilization exists, agencies must satisfy procedural burdens to justify hiring candidates who are not members of the designated protected groups.

54. Such procedural burdens serve as barriers to employment opportunities for current and prospective State employees who are not members of Minnesota's protected groups. By creating barriers to the hiring or promoting of current and prospective State employees who are not black, Hispanic, Asian, Pacific Islander, American Indian, Alaskan native, or female, Minnesota's affirmative action Policy deters executive branch agencies from hiring or promoting certain current and prospective State employees and discriminates against such individuals because of their race, color, sex, or national origin.

55. Minnesota's affirmative action Policy requires the State to discriminate against current and prospective State employees based on race, color, national origin, and sex to effectuate its unlawful race- and sex-based affirmative action Policy, because only through such discrimination can Minnesota ~~engages~~accomplish its race- and sex-balancing goals.

~~58.~~56. Minnesota is engaged in a pattern and practice of discrimination against ~~state employees~~current and prospective State employees, in violation of Section 703(a)(1) of Title VII, as amended, 42 U.S.C. § 2000e-2(a)(1), by ~~making~~having a Policy that requires

staffing and personnel decisions, including hiring, promotions, transfers, and layoffs, based onbecause of individuals' race, color, national origin, and sex.

57. Minnesota engages inMinnesota's race- and sex-based affirmative action Policy, on its face, constitutes a pattern and practice of discrimination against state employeescurrent and prospective State employees on the basisbecause of race, color, national origin, and sex in violation of Section 703(a)(1) of Title VII, as amended, 42 U.S.C. § 2000e-2(a)(1), by requiring race- and sex-based employment goals to balance its workforce.

59. Minnesota's race- and sex-based affirmative action Policy, on its face, constitutes a pattern and practice of discrimination against current and prospective State employees because of race, color, national origin, and sex in violation of Section 703(a)(1) of Title VII, as amended, 42 U.S.C. § 2000e-2(a)(1), by employing race- and sex-based employment goals.

60.58. Minnesota engages in a pattern and practice of discrimination against state employees and prospective employees on the basis of race, color, national origin, and sex in violation of Section 703(a)(1) of Title VII, as amended, 42 U.S.C. § 2000e-2(a)(1), by requiring state agencies to "justify" and receive approval before hiring employees who are not female, black, Hispanic, Asian, Pacific Islander, American Indian, or Alaskan native.

61.59. The Attorney General has reasonable cause to believe that Minnesota regularly and purposefully treats Minnesota's race- and sex-based affirmative action Policy, codified in Minnesota's statutes and rules, mandates unlawful discrimination by requiring State agencies to treat certain employeescurrent and prospective State employees

less favorably than others because of their race, color, national origin, and sex, and that this unlawful discrimination, thatit is mandated by Minnesota statutes and implementing rules, is therefore Minnesota's regular operating procedure or policy to purposefully discriminate against current and prospective State employees because of their race, color, national origin, and sex.

60. The Attorney General has reasonable cause to believe that Minnesota's race- and sex-conscious staffing and personnel practices violatebased affirmative action Policy on its face violates Section 703(a)(1) and areestablishes "a pattern or practice of resistance to the full enjoyment of" the rights of state employeescurrent and prospective State employees to equal employment opportunities without discrimination because of race, color, national origin, or sex. *See* Section 70742 U.S.C. §§ 2000e-2(a))(1), 2000e-6(a).

62.61. Because the text of Minnesota's Policy requires intentionally preferencing current and prospective State employees based on race, color, national origin, or sex, the Attorney General has reasonable cause to believe that this pattern or practice of discriminating against current and prospective State employees is of such a nature and is intended to deny the full exercise of Title VII, as amended, 42 U.S.C. § 2000e-6(a). rights.

63.62. The United States, through the United States Department of Justice, has notified Minnesota of the United States' determination that Minnesota's pattern or practice of discrimination described herein is unlawful.

**Count 2:**
**Pattern or Practice of Limiting and Classifying in Violation of Section 703(a)(2) of Title VII**

**Formatted:** Keep with next

~~64.~~63. The United States realleges and incorporates by reference all preceding paragraphs ~~1-63~~ of the Complaint as if fully stated herein.

64. An employer violates Title VII not only when it denies disfavored group "jobs and promotions," but also when it creates "*limitations* and *classifications* that would deprive any individual of employment *opportunities*." *Connecticut v. Teal*, 457 U.S. 440, 448 (1985). To put it another way, it is "'the inability to compete on an equal footing,' not the loss of an ultimate benefit" that constitutes an injury for Title VII purposes. *United States v. Bd. of Dirs. of Special Sch. Dist. No. 1, Minneapolis Pub. Schs.*, --- F. Supp. 3d ---, No. 25-CV-4571 (PJS/DJF), 2026 WL 2294611, *4 (D. Minn. Aug. 10, 2026) (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)).

65. Minnesota Statute § 43A.02, subd. 33, defines "protected groups" by race, color, national origin, ~~sex,~~ and ~~disability~~sex. This definition is not merely descriptive; it is incorporated directly into Minnesota's affirmative action ~~mandate~~Policy in Chapter 43A, including the numerical ~~goal, underutilization,~~ goals and pre-hire-justification requirements. As a result, ~~Minnesota classifies employees~~the text of Minnesota's affirmative action Policy requires agencies to classify current and prospective State employees into discrete ~~racial~~race- and sex-based groups for the purpose of affecting their employment statuses and the agencies' employment decisions.

66. Through these statutory and regulatory provisions, Minnesota usesThe text of the affirmative action Policy mandates the use of race, color, national origin, and sex as operative decision-making criteria in all staffing and personnel actionsdecisions.

67. Minnesota lawThe affirmative action Policy requires agencies to track "underutilization" of the defined protected groups and to take affirmative steps to eliminate such underutilization. Supervisors must identifydetermine the race and sex composition of theits workforce and candidate pool and determine whether a protected group is underutilized in the relevant category. When underutilization exists, agencies impose additionalmust satisfy procedural burdens onto justify hiring candidates who are not members of the designated protected groups. Such procedural burdens serve as barriers to—and therefore limit—employment opportunities for current and prospective State employees who are not members of Minnesota's protected groups.

68. These classifications To determine the race and sex composition of the workforce and candidate pool, agencies must classify all current and prospective State employees based on their race and sex. Such classification is done not for statistical analysis or to comply with any purported federal requirements but to permit Minnesota to achieve its goal of "achiev[ing] and maintain[ing] a representative work force[.]" Minn. Stat. § 43A.14.

69. Because the Policy requires the use of these classifications for employment decisions, the Policy on its face constitutes a pattern or practice of classifying current and prospective State employees in a way which would deprive or tend to deprive them of employment opportunities or otherwise adversely affect their status as employees.

68.70. Such classifications inevitably deprive those who are not in Minnesota's chosen protected groupsblack, Hispanic, Asian, Pacific Islander, American Indian, Alaskan native, or female of employment opportunities, and adversely affect their employment statuses, in violation of Section 703(a)(2) of Title VII, as amended, 42 U.S.C. § 2000e-2(a)(2). because of their race or sex.

71. MinnesotaBy creating barriers to the hiring or promoting of current and prospective State employees who are not black, Hispanic, Asian, Pacific Islander, American Indian, Alaskan native, or female, Minnesota's affirmative action Policy deters executive branch agencies from hiring or promoting certain current and prospective State employees—which limits, segregates, and classifies its their employment opportunities or otherwise adversely affects their statuses as employees—because of their race or sex.

69.72. Minnesota's affirmative action Policy requires the State to limit and classify current and prospective State employees based on race, color, national origin, and sex to effectuate its unlawful race- and sex-preference policiesbased affirmative action Policy, because only through such limiting, segregating, and classifying can Minnesota accomplish its race- and sex-balancing goals.

70.73. The Attorney General has reasonable cause to believe that Minnesota regularlyMinnesota's race- and purposefully limits, segregates,sex-based affirmative action Policy, codified in Minnesota's statutes and classifies employeesrules, mandates limiting and classifying current and prospective State employees because of their race, color, national origin, and sex, and that this limitation, segregation, and classification, and that is mandated by Minnesota statutes and implementing rules, is it is therefore

Minnesota's regular operating procedure or policy to purposefully limit and classify current and prospective State employees because of their race, color, national origin, and sex.

71. 74. The Attorney General has reasonable cause to believe that Minnesota's limitation, segregation, and classification of its employees current and prospective State employees violatesviolate Section 703(a)(2) and isare "a pattern or practice of resistance to the full enjoyment of" the rights of state employeescurrent and prospective State employees to equal employment opportunities without discrimination because of race, color, national origin, or sex. *See* Section 707(a) of Title VII, as amended, 42 U.S.C. §§§ 2000e-2(a)(2), 2000e-6(a).

75. Because it is Minnesota's policy to intentionally give preference to current and prospective State employees because of race, color, national origin, or sex, the Attorney General has reasonable cause to believe that this pattern or practice of limiting and classifying current and prospective State employees is of such a nature and is intended to deny the full exercise of Title VII rights.

72. 76. The United States, through the United States Department of Justice, has notified Minnesota of the United States' determination that Minnesota's pattern or practice of limiting, segregating, and classifying employeescurrent and prospective State employees described herein is unlawful.

**Count 3:**
**Pattern or Practice of Resistance to the Full Enjoyment of Rights Secured by Title VII in Violation of Section 707(a) of Title VII**

77. The United States realleges and incorporates by reference all preceding paragraphs of the Complaint as if fully stated herein.

78. Claims brought under Section 707(a) of Title VII are not limited to the unlawful employment practices enumerated in other sections of Title VII, including Section 703(a). *See, e.g.*, *EEOC v. Doherty Enters., Inc.*, 126 F. Supp. 3d 1305, 1311 (S.D. Fla. 2015) ("[A] resistance claim is not limited to cases involving an unlawful employment practice. Instead, a resistance claim may be brought to stop a pattern and practice of resistance to the full enjoyment to Title VII rights."); *United States ex rel. Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 355-56 (E.D. La. 1965) (enjoining defendants from engaging in threats and violence to deter African Americans from seeking employment and to deter employers from hiring them).

79. By requiring executive branch agencies to establish numerical goals for the race and sex composition of their workforces; ensuring compliance with these goals through reporting requirements, audits, and sanctions; and requiring agencies to "justify" non-affirmative action hires, Minnesota's affirmative action Policy, on its face, creates barriers to hiring or promoting current and prospective State employees who are not black, Hispanic, Asian, Pacific Islander, American Indian, Alaskan native, or female because of their race or sex.

80. By creating barriers to employment opportunities for current and prospective State employees who are not black, Hispanic, Asian, Pacific Islander, American Indian, Alaskan native, or female, Minnesota's affirmative action Policy deters executive branch agencies from hiring or promoting certain current and prospective State employees because of their race or sex.

81. Such deterrence and barriers to employment opportunities constitute a pattern or practice of resistance to the full enjoyment of rights secured by Title VII.

82. The Attorney General has reasonable cause to believe that Minnesota's race- and sex-based affirmative action Policy, codified in Minnesota's statutes and rules, demonstrates "a pattern or practice of resistance to the full enjoyment of" the Title VII rights of current and prospective State employees, including the rights under Section 703(a) to be free from employment-related classification, limitation, and discrimination because of race and sex. *See* 42 U.S.C. §§ 2000e-2(a)(1)-(2), 2000e-6(a).

83. Because the text of Minnesota's affirmative action Policy requires the State to establish quotas to balance the race and sex composition of the State workforce; requires preferences for current and prospective State employees based on race, color, national origin, or sex; and imposes onerous reporting requirements, audits, and sanctions to ensure compliance with such requirements, the Attorney General has reasonable cause to believe that this pattern or practice of resistance to the full enjoyment of Title VII rights is of such a nature and is intended to deny current and prospective State employees the full exercise of Title VII rights.

84. The United States, through the United States Department of Justice, has notified Minnesota of the United States' determination that Minnesota's pattern or practice described herein is unlawful.

**Count 4:**
**Preemption**

85. The United States realleges and incorporates by reference all preceding paragraphs of the Complaint as if fully stated herein.

86. Title VII expressly preempts "any [state] law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter." 42 U.S.C. § 2000e-7.

87. As described in Counts 1 and 2, the text of Minnesota's affirmative action Policy—as codified in Minnesota statutes and regulations—requires State agencies to engage in unlawful employment practices under Title VII. Accordingly, Title VII expressly preempts such State laws.

88. Title VII further preempts Minnesota's statutory and regulatory affirmative action Policy to the extent that it otherwise conflicts with Title VII.

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays that this Court enter judgment against Minnesota and grant the following relief:

a. A declaratory judgment that ~~Minnesota is engaged in~~Minnesota's official race- and sex-based affirmative action Policy, codified at Minn. Stat. §§ 43A.01, 43A.09, 43A.14, 43A.19, 43A.191 and Minn. R. 3905.0100 *et seq.*, on its face establishes a pattern or practice ~~that unlawfully discriminates against, limits, segregates, and classifies employees and prospective employees on~~ of resistance to the ~~basis~~full enjoyment of rights secured by Title VII, including the rights under Section 703(a) to be free from employment-related classification, limitation, and discrimination because of

race, color, national origin, and sex in violation of Title VII;, and that the pattern or practice is of such a nature and is intended to deny the full exercise of Title VII rights.

b. A permanent injunction prohibiting Minnesota and its officers, agents, employees, successors, and attorneys, and other persons who are in active concert or participation with Minnesota, from further violating Title VII by implementingenforcing the race- and sex-consciousbased affirmative action Policy; implementing race- or sex-based staffing and personnel practices (including, but not limited, to, hiring, promoting, transferring, or laying- off current or prospective State employees, or any other similar actions), on the basisbecause of race, color, national origin, or sex; establishing numerical goals for the race, color, national origin, or sex composition of the State workforce; and enforcing any provision of the affirmative action Policy that conflicts with Title VII.

c. An award of equitable relief to any employees and prospective employees who faced discrimination on the basis of race, color, national origin, or sex as a result of Minnesota's race- and sex-conscious staffing and personnel practices (including, but not limited, to hiring, promoting, transferring, or laying-off current or prospective employees, or any other similar actions);

d. An award of any applicable costs and fees; and

e. An award of all such other additional relief as the interests of justice may require.

DATED: ~~January 14~~September 1, 2026

DANIEL N. ROSEN
United States Attorney
District of Minnesota

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

~~JESUS A. OSETE~~
~~Principal~~ ~~Deputy Assistant Attorney General~~

ERIC SELL
Deputy Assistant Attorney General

~~Counsel~~

~~JEFFREY MORRISON~~
~~Acting~~ HILARY PINION
Chief, Employment Litigation Section

*s/ Greta Gieseke*
GREGORY DOLIN (DC No. 497455)
Senior Counsel
GRETA GIESEKE (TX No. 24132925)
Trial Attorney

Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 514-3847
Email: greta.gieseke@usdoj.gov

ATTORNEYS FOR PLAINTIFF
UNITED STATES OF AMERICA